# MASSACHUSETTS *v.* UPTON

No. 83–1338.   Decided May 14, 1984

PER CURIAM.

Last Term, in *Illinois* v. *Gates*, 462 U. S. 213 (1983), we held that the Fourth Amendment's requirement of probable cause for the issuance of a warrant is to be applied, not according to a fixed and rigid formula, but rather in the light of the "totality of the circumstances" made known to the magistrate. We also emphasized that the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant. In this case, the Supreme Judicial Court of Massachusetts, interpreting the probable-cause requirement of the Fourth Amendment to the United States Constitution, continued to rely on the approach set forth in cases such as *Aguilar* v. *Texas*, 378 U. S. 108 (1964), and *Spinelli* v. *United States*, 393 U. S. 410 (1969). 390 Mass. 562, 458 N. E. 2d 717 (1983). Since this approach was rejected in *Gates*, we grant the petition for certiorari in this case and reverse the judgment of the Supreme Judicial Court.

At noon on September 11, 1980, Lieutenant Beland of the Yarmouth Police Department assisted in the execution of a search warrant for a motel room reserved by one Richard Kelleher at the Snug Harbor Motel in West Yarmouth. The search produced several items of identification, including

credit cards, belonging to two persons whose homes had recently been burglarized. Other items taken in the burglaries, such as jewelry, silver, and gold, were not found at the motel.

At 3:20 p. m. on the same day, Lieutenant Beland received a call from an unidentified female who told him that there was "a motor home full of stolen stuff" parked behind #5 Jefferson Ave., the home of respondent George Upton and his mother. She stated that the stolen items included jewelry, silver, and gold. As set out in Lieutenant Beland's affidavit in support of a search warrant:

> "She further stated that George Upton was going to move the motor home any time now because of the fact that Ricky Kelleher's motel room was raided and that George [Upton] had purchased these stolen items from Ricky Kelleher. This unidentified female stated that she had seen the stolen items but refused to identify herself because 'he'll kill me,' referring to George Upton. I then told this unidentified female that I knew who she was, giving her the name of Lynn Alberico, who I had met on May 16, 1980, at George Upton's repair shop off Summer St., in Yarmouthport. She was identified to me by George Upton as being his girlfriend, Lynn Alberico. The unidentified female admitted that she was the girl that I had named, stating that she was surprised that I knew who she was. She then told me that she'd broken up with George Upton and wanted to burn him. She also told me that she wouldn't give me her address or phone number but that she would contact me in the future, if need be." See 390 Mass., at 564 n. 2, 458 N. E. 2d, at 718, n. 2.

Following the phone call, Lieutenant Beland went to Upton's house to verify that a motor home was parked on the property. Then, while other officers watched the premises, Lieutenant Beland prepared the application for a search war-

rant, setting out all the information noted above in an accompanying affidavit. He also attached the police reports on the two prior burglaries, along with lists of the stolen property. A Magistrate issued the warrant, and a subsequent search of the motor home produced the items described by the caller and other incriminating evidence. The discovered evidence led to Upton's conviction on multiple counts of burglary, receiving stolen property, and related crimes.

On appeal to the Supreme Judicial Court, respondent argued that the search warrant was not supported by a sufficient showing of "probable cause" under the Fourth Amendment. With respect to our *Gates* opinion, that court said:

> "It is not clear that the *Gates* opinion has announced a significant change in the appropriate Fourth Amendment treatment of applications for search warrants. Looking at what the Court did on the facts before it, and rejecting an expansive view of certain general statements not essential to the decision, we conclude that the *Gates* opinion deals principally with what corroboration of an informant's tip, not adequate by itself, will be sufficient to meet probable cause standards." 390 Mass., at 568, 458 N. E. 2d, at 720.

Prior to *Gates*, the Fourth Amendment was understood by many courts to require strict satisfaction of a "two-pronged test" whenever an affidavit supporting the issuance of a search warrant relies on an informant's tip. It was thought that the affidavit, first, must establish the "basis of knowledge" of the informant—the particular means by which he came by the information given in his report; and, second, that it must provide facts establishing either the general "veracity" of the informant or the specific "reliability" of his report in the particular case. The Massachusetts court apparently viewed *Gates* as merely adding a new wrinkle to this two-pronged test: where an informant's veracity and/or basis of knowledge are not sufficiently clear, substantial corroboration of the tip may save an otherwise invalid warrant.

"We do not view the *Gates* opinion as decreeing a standardless 'totality of the circumstances' test. The informant's veracity and the basis of his knowledge are still important but, where the tip is adequately corroborated, they are not elements indispensible *[sic]* to a finding of probable cause. It seems that, in a given case, the corroboration may be so strong as to satisfy probable cause in the absence of any other showing of the informant's 'veracity' and any direct statement of the 'basis of [his] knowledge.'" 390 Mass., at 568, 458 N. E. 2d, at 721.

Turning to the facts of this case, the Massachusetts court reasoned, first, that the basis of the informant's knowledge was not "forcefully apparent" in the affidavit. *Id.*, at 569, 458 N. E. 2d, at 721. Although the caller stated that she had seen the stolen items and that they were in the motor home, she did not specifically state that she saw them in the motor home. Second, the court concluded that "[n]one of the common bases for determining the credibility of an informant or the reliability of her information is present here." *Ibid.* The caller was not a "tried and true" informant, her statement was not against penal interest, and she was not an "ordinary citizen" providing information as a witness to a crime. "She was an anonymous informant, and her unverified assent to the suggestion that she was Lynn Alberico does not take her out of that category." *Id.*, at 570, 458 N. E. 2d, at 722.

Finally, the court felt that there was insufficient corroboration of the informant's tip to make up for its failure to satisfy the two-pronged test. The facts that tended to corroborate the informant's story were that the motor home was where it was supposed to be, that the caller knew of the motel raid which took place only three hours earlier, and that the caller knew the name of Upton and his girlfriend. But, much as the Supreme Court of Illinois did in the opinion we reviewed in *Gates*, the Massachusetts court reasoned that each item of corroborative evidence either related to innocent, nonsuspicious conduct or related to an event that took place in

public. To sustain the warrant, the court concluded, more substantial corroboration was needed. The court therefore held that the warrant violated the Fourth Amendment to the United States Constitution and reversed respondent's convictions.

We think that the Supreme Judicial Court of Massachusetts misunderstood our decision in *Gates.* We did not merely refine or qualify the "two-pronged test." We rejected it as hypertechnical and divorced from "the factual and practical considerations of everday life on which reasonable and prudent men, not legal technicians, act." *Brinegar* v. *United States,* 338 U. S. 160, 175 (1949). Our statement on that score was explicit. "[W]e conclude that it is wiser to abandon the 'two-pronged test' established by our decisions in *Aguilar* and *Spinelli.* In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations." *Gates,* 462 U. S., at 238. This "totality-of-the-circumstances" analysis is more in keeping with the "practical, common-sense decision" demanded of the magistrate. *Ibid.*

We noted in *Gates* that "the 'two-pronged test' has encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate." *Id.,* at 234–235 (footnote omitted). This, we think, is the error of the Massachusetts court in this case. The court did not consider Lieutenant Beland's affidavit in its entirety, giving significance to each relevant piece of information and balancing the relative weights of all the various indicia of reliability (and unreliability) attending the tip. Instead, the court insisted on judging bits and pieces of information in isolation against the artificial standards provided by the two-pronged test.

The Supreme Judicial Court also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence

viewed as a whole provided a "substantial basis" for the Magistrate's finding of probable cause, the court conducted a *de novo* probable-cause determination. We rejected just such after-the-fact, *de novo* scrutiny in *Gates*. *Id.*, at 236. "A grudging or negative attitude by reviewing courts toward warrants," *United States* v. *Ventresca*, 380 U. S. 102, 108 (1965), is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case. *Gates, supra,* at 237, n. 10.* A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.

Examined in light of *Gates*, Lieutenant Beland's affidavit provides a substantial basis for the issuance of the warrant. No single piece of evidence in it is conclusive. But the pieces fit neatly together and, so viewed, support the Magistrate's determination that there was "a fair probability that contraband or evidence of a crime" would be found in Upton's motor home. 462 U. S., at 238. The informant claimed to have seen the stolen goods and gave a description of them which tallied with the items taken in recent burglaries. She knew of the raid on the motel room—which produced evidence connected to those burglaries—and that the room had been reserved by Kelleher. She explained the connection between

---

*"If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search. In addition, the possession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring 'the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.' *United States* v. *Chadwick*, 433 U. S. 1, 9 (1977)." *Gates*, 462 U. S., at 236.

Kelleher's motel room and the stolen goods in Upton's motor home. And she provided a motive both for her attempt at anonymity—fear of Upton's retaliation—and for furnishing the information—her recent breakup with Upton and her desire "to burn him."

The Massachusetts court dismissed Lieutenant Beland's identification of the caller as a mere "unconfirmed guess." 390 Mass., at 569, n. 6, 458 N. E. 2d, at 721, n. 6. But "probable cause does not demand the certainty we associate with formal trials." *Gates, supra,* at 246. Lieutenant Beland noted that the caller "admitted that she was the girl I had named, stating that she was surprised that I knew who she was." It is of course possible that the caller merely adopted Lieutenant Beland's suggestion as "a convenient cover for her true identity." 390 Mass., at 570, 458 N. E. 2d, at 722. But given the caller's admission, her obvious knowledge of who Alberico was and how she was connected with Upton, and her explanation of her motive in calling, Lieutenant Beland's inference appears stronger than a mere uninformed and unconfirmed guess. It is enough that the inference was a reasonable one and conformed with the other pieces of evidence making up the total showing of probable cause.

In concluding that there was probable cause for the issuance of this warrant, the Magistrate can hardly be accused of approving a mere "hunch" or a bare recital of legal conclusions. The informant's story and the surrounding facts possessed an internal coherence that gave weight to the whole. Accordingly, we conclude that the information contained in Lieutenant Beland's affidavit provided a sufficient basis for the "practical, common-sense decision" of the Magistrate. "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States* v. *Ventresca, supra,* at 109.

The judgment of the Supreme Judicial Court of Massachu-
setts is reversed, and the case is remanded for further pro-
ceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN and JUSTICE MARSHALL dissent from
the summary disposition of this case and would deny the
petition for certiorari.

JUSTICE STEVENS, concurring in the judgment.

In my opinion the judgment of the Supreme Judicial Court
of Massachusetts reflects an error of a more fundamental
character than the one this Court corrects today. It rested
its decision on the Fourth Amendment to the United States
Constitution without telling us whether the warrant was
valid as a matter of Massachusetts law.[1] It has thereby in-
creased its own burdens as well as ours. For when the case
returns to that court, it must then review the probable-cause
issue once again and decide whether or not a violation of the
state constitutional protection against unreasonable searches
and seizures has occurred. If such a violation did take place,
much of that court's first opinion and all of this Court's opin-
ion are for naught.[2] If no such violation occurred, the sec-

---

[1] Indeed, that court rather pointedly refused to consider whether the
search violated the provisions of Art. 14 of the Massachusetts Declaration
of Rights. It stated, in part:
"If we have correctly construed the significance of *Illinois* v. *Gates,* the
Fourth Amendment standards for determining probable cause to issue a
search warrant have not been made so much less clear and so relaxed as to
compel us to try our hand at a definition of standards under art. 14. If we
have misassessed the consequences of the *Gates* opinion and in fact the
*Gates* standard proves to be unacceptably shapeless and permissive, this
court may have to define the protections guaranteed to the people against
unreasonable searches and seizures by art. 14, and the consequences of the
violation of those protections." 390 Mass. 562, 573–574, 458 N. E. 2d 717,
724 (1983).

[2] Cf. *South Dakota* v. *Opperman,* 428 U. S. 364 (1976) (rev'g 89 S. D.
25, 228 N. W. 2d 152), on remand, 247 N. W. 2d 673 (1976) (judgment

ond proceeding in that court could have been avoided by a ruling to that effect when the case was there a year ago.

If the Magistrate had violated a state statute when he issued the warrant, surely the State Supreme Judicial Court would have so held and thereby avoided the necessity of deciding a federal constitutional question. I see no reason why it should not have followed the same sequence of analysis when an arguable violation of the State Constitution is disclosed by the record. As the Oregon Supreme Court has stated:

> "The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or of style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law." *Sterling* v. *Cupp*, 290 Ore. 611, 614, 625 P. 2d 123, 126 (1981).[3]

The maintenance of the proper balance between the respective jurisdictions of state and federal courts is always a difficult task. In recent years I have been concerned by what I have regarded as an encroachment by this Court into territory that should be reserved for state judges. See, *e. g.*, *Michigan* v. *Long*, 463 U. S. 1032, 1065 (1983) (STEVENS, J., dissenting); *South Dakota* v. *Neville*, 459 U. S. 553, 566 (1983) (STEVENS, J., dissenting); *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 477–489 (1981) (STEVENS, J., dissenting); *Idaho Department of Employment* v. *Smith*, 434 U. S. 100, 103–105 (1977) (STEVENS, J., dissenting in part). The maintenance of this balance is, however, a two-way

---

reinstated on state grounds); *South Dakota* v. *Neville*, 459 U. S. 553 (1983) (rev'g 312 N. W. 2d 723 (1981)), on remand, 346 N. W. 2d 425 (1984) (judgment reinstated in part on state grounds).

[3] See also *State* v. *Kennedy*, 295 Ore. 260, 666 P. 2d 1316 (1983), and cases cited therein, *id.*, at 262, 666 P. 2d, at 1318; *Hewitt* v. *State Accident Ins. Fund Corp.*, 294 Ore. 33, 41–42, 653 P. 2d 970, 975 (1982).

street.   It is also important that state judges do not unnecessarily invite this Court to undertake review of state-court judgments.   I believe the Supreme Judicial Court of Massachusetts unwisely and unnecessarily invited just such review in this case.   Its judgment in this regard reflects a misconception of our constitutional heritage and the respective jurisdictions of state and federal courts.

The absence of a Bill of Rights in the Constitution proposed by the Federal Constitutional Convention of 1787 was a major objection to the Convention's proposal.   See, *e. g.*, 12 The Papers of Thomas Jefferson 438 (Boyd ed. 1955).   In defense of the Convention's plan Alexander Hamilton argued that the enumeration of certain rights was not only unnecessary, given that such rights had not been surrendered by the people in their grant of limited powers to the Federal Government, but "would even be dangerous" on the ground that enumerating certain rights could provide a "plausible pretense" for the Government to claim powers not granted in derogation of the people's rights.   The Federalist No. 84, pp. 573, 574 (Ford ed. 1898) (A. Hamilton).   The latter argument troubled the First Congress during deliberations on the Bill of Rights, and its solution became the Ninth Amendment.   See 1 Annals of Congress 439 (1789) (remarks of Rep. Madison).

The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."   To the extent that the Bill of Rights is applicable to the States under the Fourteenth Amendment, the principle embodied in the Ninth Amendment is applicable as well.   The Ninth Amendment, it has been said, states but a truism.   But that truism goes to the very core of the constitutional relationship between the individual and governmental authority, and, indeed, between sovereigns exercising authority over the individual.

In my view, the court below lost sight of this truism, and permitted the enumeration of certain rights in the Fourth Amendment to disparage the rights retained by the people of

Massachusetts under Art. 14 of the Massachusetts Declaration of Rights. It is of course not my role to state what rights Art. 14 confers upon the people of Massachusetts; under our system of federalism, only Massachusetts can do that. The state court refused to perform that function, however, and instead strained to rest its judgment on federal constitutional grounds.

Whatever protections Art. 14 does confer are surely disparaged when the Supreme Judicial Court of Massachusetts refuses to adjudicate their very existence because of the enumeration of certain rights in the Constitution of the United States. The rights conferred by Art. 14 may not only exceed the rights conferred by the Fourth Amendment as construed by this Court in *Gates*, but indeed may exceed the rights conferred by the Fourth Amendment as construed by the state court. The dissent followed the approach of the majority to its logical conclusion, stating that there "appears to be no logical basis, and no support in the case law, for interpreting the term 'cause' in art. 14 differently from the 'probable cause' requirement of the Fourth Amendment." 390 Mass. 562, 580, 458 N. E. 2d 717, 727 (1983). "The right question," however, "is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand. The answer may turn out the same as it would under federal law. The state's law may prove to be more protective than federal law. The state law also may be less protective. In that case the court must go on to decide the claim under federal law, assuming it has been raised." Linde, E Pluribus— Constitutional Theory and State Courts, 18 Ga. L. Rev. 165, 179 (1984).

It must be remembered that for the first century of this Nation's history, the Bill of Rights of the Constitution of the United States was solely a protection for the individual in relation to federal authorities. State Constitutions protected

the liberties of the people of the several States from abuse by state authorities. The Bill of Rights is now largely applicable to state authorities and is the ultimate guardian of individual rights. The States in our federal system, however, remain the primary guardian of the liberty of the people. The Massachusetts court, I believe, ignored this fundamental premise of our constitutional system of government. In doing so, it made an ill-advised entry into the federal domain.

Accordingly, I concur in the Court's judgment.