THE STATE OF OHIO, APPELLANT, *v.* FARNDON, APPELLEE, ET AL.

(Nos. 47789 and 47790 — Decided November 5, 1984.)

*John T. Corrigan,* prosecuting attorney, for appellant.
*Gordon S. Friedman,* for appellee.

PATTON, J. This appeal arises from a judgment entered by the court of common pleas granting the motion to suppress evidence filed by the appellee, David Farndon. The facts giving rise to

this appeal as contained in the record provide the following:

On May 12, 1983, the Cuyahoga County Grand Jury handed down two indictments against the appellee for criminal activities alleged to have occurred on May 5, 1983, which stemmed from the arrest of three other individuals. In case No. CR-182,369, the appellee was indicted with Jerry Simon, Wayne Agner, and Bobbie Sue Settlemeir for selling cocaine in an amount equal to or exceeding three times the bulk amount, in violation of R.C. 2925.03, and for one count of possession of cocaine in an amount equal to or exceeding the bulk amount but in an amount less than three times that amount, in violation of R.C. 2925.03. In case No. CR-182,479, the appellee was individually indicted for one count of possession of cocaine in an amount less than the bulk amount, in violation of R.C. 2925.11; for one count of possession of valium in an amount less than the bulk amount, in violation of R.C. 2925.11; and for one count of possession of criminal tools, in violation of R.C. 2923.24.

On May 17, 1983, the appellee was arraigned and entered a plea of not guilty. His cases were assigned to Judge Frederick Coleman. On November 16, 1983, a hearing was held on the motion to suppress evidence in case No. CR-182,369. The court granted appellee's motion to suppress with regard to a vial of suspected cocaine and a plastic straw confiscated from the appellee's person and as to an oral statement made by him. On November 17, 1983, the trial court granted the state's request to extend its ruling on the motion to suppress filed on behalf of the appellee to case No. CR-182,479 before the state appealed the ruling.

The state presented three witnesses during the hearing on the motion to suppress. Cleveland Police Detective George Santiago of the Bureau of Special Operations and Narcotics Squad testified as to the events that occurred on May 5, 1983, which led to the arrest of the appellee. Santiago testified that on May 5, 1983, Detective Neelon of the Narcotics Unit of the Cleveland Police Department and John Bell, Special Agent with the Federal Bureau of Investigation, while acting undercover, arrested three individuals (Jerry Simon, Wayne Agner, and Bobbie Sue Settlemeir) for violation of Ohio drug laws. The arrest occurred during a drug transaction in which the officers were to purchase one pound of cocaine from the three individuals in a hotel room at the Country Inn Hotel located in Cleveland, Ohio. Prior to the undercover operation, all police officers had been briefed that the cocaine was being brought by an unidentified person from Ann Arbor, Michigan.

Santiago testified that the officers were undercover and that Detective Neelon carried a transmitter which monitored the transaction. Santiago was stationed in the next room recording the entire transaction and waiting for a prearranged signal from Detective Neelon that would indicate that the transaction and arrest had been completed. While he was monitoring the transaction, Santiago learned that the three individuals had only brought one-half pound of cocaine to the room and that a third party had kept the other half pound of cocaine until one of the individuals had taken him part of the money.

Santiago testified that after he heard the signal, he entered the hotel room and observed that the three individuals had been arrested. His testimony indicated he entered and exited the room several times to fulfill his duties. During that time, Detective Neelon was questioning the individuals as to the identity of the third party who had the other half-pound of cocaine.

Santiago testified that at one point

when he was in the hotel room, he overheard one of the arrested persons describe the third party. At that point, he left the room alone to try to locate the third party. He stated that the description of the suspect was "a suspect approximately five foot four inches tall, thin build, moustache, wearing a dark brown jacket, light trousers, also driving a 1982 Chevette."

On cross-examination, counsel for the appellee played various portions of the tape. When questioned about the cars which were mentioned, Santiago testified that he had heard someone say Chevy, a Nova, then a Chevette, and at one point someone spoke about a red Mustang. After listening to the tape, several important facts were revealed concerning the cars which were discussed. Bobbie Sue Settlemeir mentioned the red Mustang. She stated that she had driven down in the red Mustang. Further conversation took place between Detective Neelon and one of the male suspects who stated that the person the police were looking for was driving a small car, a Chevy — either a Chevy Nova or Chevette — with Michigan license plates. On the tape, Wayne Agner stated that he had been driving with the third man now wanted by the police. That man had left him off at the Dutch Pantry Restaurant and had told Agner that he was going to wait there in the restaurant. He also told Agner that "if it [the drug purchase] doesn't go, he was going to call." In addition, the tape also revealed that the police were also checking for the possible involvement of a third car containing other friends of the three arrested in the hotel room.

Santiago testified that he went outside to the area of a Dutch Pantry Restaurant located just north of the Country Inn. On the way to the restaurant, he observed an unattended brown Chevette with Michigan license plates in the restaurant's parking lot. Upon entering the restaurant, Detective Santiago observed an individual later identified as the appellee who he thought fit the description. Santiago stated it was his intention to arrest the suspect when he first saw him in the restaurant. However, rather than approach the appellee, Santiago said he sat down across from him at the opposite end of the restaurant. Santiago stated the appellee appeared to be nervous and when he tried to leave his booth, Santiago approached him. Santiago testified that at that point, he identified himself as a narcotics detective and asked the appellee if he was driving the Chevette outside. At this time, appellee was neither under arrest nor informed of his *Miranda* rights. Appellee responded affirmatively to Santiago's question. The detective then patted down the appellee. No weapons were found; however, Santiago did find a vial containing what appeared to be cocaine and a part of a straw. At that point, Santiago placed the appellee under arrest. The appellee was then led out of the restaurant and placed in the custody of Detective Philip Smith, who then gave the appellee his *Miranda* rights. From there, the appellee was taken to the hotel room in the Country Inn, where the other suspects had been arrested.

Sergeant Perry Ward testified that he was part of the surveillance team positioned outside to watch the motel. He had been briefed prior to the occurrence and was aware that one pound of cocaine was supposed to be purchased. He testified that he was present in the motel room after the three individuals were arrested, and that only one-half pound of cocaine had been confiscated.

Sergeant Ward testified that after questioning Jerry Simon and/or Wayne Agner, he obtained a description of a third party which he broadcast over a high band portable radio from the hotel room to the outside cars. The description he broadcast was that of a white male, mid-twenties, approximately five

feet six to five feet eight inches, thin build, curly hair and wearing dark clothes.

Detective Philip Smith testified that when he entered the hotel room at Country Inn, he observed Detective Neelon and Agent Bell with their weapons drawn, the three suspects against the wall, and Detective Neelon questioning one of the suspects. After conferring with Neelon and Ward, Detective Smith left the hotel room and went outside to his undercover car. He began looking for a Chevette automobile with Michigan plates and a white male approximately five feet four or five feet six inches tall, thin build, brown curly hair, beard, and brown jacket with light colored pants. He observed an individual fitting the description exiting the Dutch Pantry Restaurant with Detective Santiago. Santiago brought the appellee to Smith's car, where Smith gave him his *Miranda* rights and then escorted the appellee back to the hotel room.

Appellee filed a motion to suppress the oral statement made to Detective Santiago and the vial and straw confiscated from his person. The court granted the motion and it is from that judgment the state appeals and assigns two errors:

"I. The trial court erred [in] granting defendant's motion to suppress a straw and a vial of suspected cocaine found on his person because the search and seizure was [*sic*] incident to a valid arrest based upon probable cause.

"II. The trial court erred in granting the defendant's motion to suppress an oral statement made to a police officer prior to his arrest."

## I

The state contends that the police officer had reliable information which was sufficient to make a warrantless arrest based on probable cause, and any evidence discovered during a search is admissible because the search was incident to a valid arrest. This contention has merit.

If the police conduct a warrantless search of a person and find evidence of crime during the search and then place the individual searched under arrest, this search may not be justified as being incident to the subsequent arrest if the arrest is based upon the fruits of the prior search. "It is axiomatic that an incident search may not precede an arrest and serve as part of its [the arrest's] justification." *Sibron* v. *New York* (1968), 392 U.S. 40, 63. However, the United States Supreme Court has held in *Rawlings* v. *Kentucky* (1980), 448 U.S. 98, 111, that, "[w]here the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa," so long as the fruits of the search were not necessary to support probable cause to arrest.

In the case *sub judice,* the admissibility of the evidence depends upon a finding that the search was legal, which in turn depends upon whether the warrantless arrest was legal. In order for a warrantless arrest to be constitutionally valid, the police officer must have probable cause to make the arrest. In Ohio, "[t]o have probable cause, the arresting officer must have sufficient information, derived from a reasonably trustworthy source, to warrant a prudent man in believing that a felony has been committed and that it has been committed by the accused." *State* v. *Timson* (1974), 38 Ohio St. 2d 122, 127.

Recently, the United States Supreme Court reexamined the concept of probable cause in the case of *Illinois* v. *Gates* (1983), 76 L. Ed. 2d 527. In *Gates,* the Supreme Court reevaluated the application and interpretation that the lower courts had given to probable cause. The court then redefined probable cause and applied it to the current issue in the case before it — sufficiency

of an informant's hearsay to constitute probable cause to issue a search warrant.

In examining the concept of probable cause, the Supreme Court held, as noted in paragraph ten of the headnotes:

"Probable cause is a fluid concept — turning on the assessment of probabilities in particular contexts — not readily, or even usefully, reduced to a neat set of rules * * *."

The court abandoned what they called "the rigid two-pronged test" under *Aguilar* v. *Texas* (1964), 378 U.S. 108, and *Spinelli* v. *United States* (1969), 393 U.S. 410, which had been the basis for establishing probable cause to issue a search warrant based on an informant's tip. The court stated at 543-544:

"[A] totality of the circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip. Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.' " (Footnote omitted.)

Citing to *Brinegar* v. *United States* (1949), 338 U.S. 160, the Supreme Court in *Gates, supra,* at 544, confirmed that probable cause deals " 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "

The court also cited to its decision in *United States* v. *Cortez* (1981), 449 U.S. 411, stating its observation regarding "particularized suspicion," is also applicable to the probable cause standard:

" 'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same

— and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " *Gates, supra,* at 544.

The Supreme Court stated that the actions taken by the lower courts in their post-*Spinelli* decisions were inadequate to serve the public. The court held at 547-548:

"[T]he direction taken by decisions following Spinelli poorly serves 'the most basic function of any government': 'to provide for the security of the individual and of his property.' Miranda v. Arizona, 384 U.S. 436, 539 * * * (1966) (White, J., dissenting). The strictures that inevitably accompany the 'two-pronged test' cannot avoid seriously impeding the task of law enforcement, see e.g., n. 9 supra. If, as the Illinois Supreme Court apparently thought, that test must be rigorously applied in every case, anonymous tips seldom would be of greatly diminished value in police work. * * *"

The court gave several examples to illustrate the principles expressed in *Brinegar* and *Cortez:*

"If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip. See United States v. Sellers, 483 F. 2d 37 (CA5 1973). Likewise, if an unquestionably honest citizen comes forward with a report of criminal activity — which if fabricated would subject him to criminal liability — we have found rigorous scrutiny of the basis of his knowledge unnecessary. Adams v. Williams, supra. Conversely, even if we entertain some doubt as to an informant's motives, his explicit and

detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case. * * *'' (Footnote omitted.) *Gates, supra,* at 545.

The court held "the flexible, common-sense standard articulated in Jones [v. United States (1960), 362 U.S. 257, United States v.] Ventresca [(1965), 380 U.S. 102,] and Brinegar [v. United States, supra,] better serves the purposes of the Fourth Amendment's probable cause requirement." *Id.* at 549. In conclusion, the Supreme Court stated, "it is wiser to abandon the 'two-pronged test' established by our decisions in Aguilar and Spinelli. In its place we reaffirm the totality of the circumstances analysis that traditionally has informed probable cause determinations." (Footnote omitted.) *Id.* at 548.

The Supreme Court solidified the *Gates* decision the following term in *Massachusetts* v. *Upton* (1984), 80 L. Ed. 2d 721. In that case, the issue presented was the validity of a search warrant issued on the basis of an affidavit which relied on an informant's tip and whether the affidavit was sufficient to establish probable cause. In *Upton,* the Supreme Court reaffirmed the position it took in *Gates.* In fact, the Supreme Court chided the Supreme Judicial Court of Massachusetts, stating that it had misunderstood the *Gates* decision. The Supreme Court stated at 726-727:

"* * * Our statement on that score was explicit. '[W]e conclude that it is wiser to abandon the "two-pronged test" established by our decisions in Aguilar and Spinelli. In its place we reaffirm the totality of the circumstances analysis that traditionally has informed probable cause determinations.' ''

The Supreme Court stated in *Upton, supra,* at 727, that the lower court erred by not considering the affidavit in its entirety, "giving significance to each relevant piece of information and balancing the relative weights of all the various indicia of reliability (and unreliability) attending the tip."

The court held that each bit of information cannot be judged in isolation because it cannot sensibly be divorced from the other facts present. Although the decisions in *Gates* and *Upton* both pertain to probable cause as applied to the issuance of a search warrant, both cases illustrate the attitude of the United States Supreme Court toward determining whether or not probable cause exists. In both cases, the Supreme Court has stated that the merit of the information received must be examined as a whole based upon the total circumstances, not individually, isolated from the remaining facts.

In the present case, the information concerning the description of the third party and the type of car he was driving was obtained by the police after questioning the three suspects arrested in the hotel room. The key issue is whether this information was derived from a "reasonably trustworthy source" given the methods employed by the police to convince the suspects to supply the information. After a meticulous review of the entire record, in conjunction with a careful listening to the tape recording of the transaction, received into evidence as a joint exhibit, it is clearly evident that the arrest of the appellee met the standards of probable cause.

Contrary to the assertions of counsel for the appellee, the tape reveals that Detective Neelon did not threaten the arrested suspects. The detective never raised his voice but rather explained to the suspects the law in Ohio regarding illegal drugs and the penalties involved. He gave his opinion as to their guilt; however, he then qualified it by stating that it was a jury's decision and he was not trying the case. The tape also reveals that the arrested female was upset; however, after being arrested and informed of the possible prison term

for her involvement, being upset is a natural reaction. Nothing indicates that either of the male suspects had reason to fear for her safety. She was not being threatened to induce one of the male suspects to give a description.

The arrest on the day in question was the culmination of an ongoing investigation. As a result of previous meetings with Jerry Simon, the detectives were aware that the cocaine was coming from Michigan. On the day in question, during the undercover operation, the police discovered that a third person was also involved. While questioning the three persons arrested in the hotel room, the police were given a description of the third party's car, and a car fitting that description bearing Michigan license plates was found in the Dutch Pantry parking lot. The various descriptions of the third party were substantially consistent and an individual fitting the descriptions was arrested inside the Dutch Pantry. Therefore, after analyzing the total circumstances, and assessing the relative weights of all the various indicia of reliability attending the arrested suspect's description, it is clear that probable cause to arrest the appellee existed. *State* v. *Timson* (1974), 38 Ohio St. 2d 122 [67 O.O.2d 140]; see *United States* v. *Ross* (1982), 456 U.S. 798[1]; contra *State* v. *Hill* (1977), 52 Ohio App. 2d 393 [6 O.O.3d 436].

Accordingly, although the arrest was made without a warrant, it was a lawful arrest. The search was valid as being made incident to the lawful arrest, and any evidence seized can be used.

Appellant's first assignment of error is well-taken.

## II

In its second assignment of error, appellant contends that the appellee's oral statement made to the police officer prior to the appellee's arrest should not be suppressed. This contention has merit.

Counsel for the appellee states that Detective Santiago lacked probable cause to search and arrest the appellee; therefore, he lacked the authority to question the appellee. In addition, counsel for the appellee states that for all intents and purposes, the appellee was in custody when Detective Santiago questioned him and therefore should have received his *Miranda* warnings prior to being questioned.

The issue of probable cause has already been discussed; therefore, the threshold issue raised in this assignment is whether the police interrogated appellee while he was "in custody," in violation of his *Miranda* rights. In *Miranda* v. *Arizona* (1966), 384 U.S. 436, 444 [36 O.O.2d 237], the United States Supreme Court held "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (Emphasis *sic.*) The court continued by stating at 481:

"As we have noted, our decision does not in any way preclude police from carrying out their traditional investigatory functions."

---

[1] In *United States* v. *Ross* (1982), 456 U.S. 798, the United States Supreme Court examined the issue of a warrantless search of an automobile that had been stopped based upon probable cause due to information supplied by a reliable informant.

The Supreme Court held at 823:

"The scope of a warrantless search based on probable cause is no narrower — and no broader — than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize." (Footnote omitted.)

At 477, the court stated:

"General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."

In *Rhode Island* v. *Innis* (1980), 446 U.S. 291, 298, the United States Supreme Court further examined the *Miranda* decision and stated that the *Miranda* rules were to apply in other situations besides "those police interrogation practices that involve express questioning of a defendant while in custody." The court held at 299:

"The concern of the Court in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination."

It is clear that the police are required to provide *Miranda* warnings when conducting a "custodial interrogation." The test for determining whether an interrogation is custodial had been set forth by this court in *State* v. *Smith* (Nov. 20, 1975), Cuyahoga App. No. 33635, unreported. In *Smith,* the court held at 10:

"In the cases that have held general on-the-scene questioning to be a 'custodial interrogation' the courts found an additional element of *coercion* not normally present in general on-the-scene inquiries or found that the police *investigation had focused on the accused.* See *United States* v. *DeLaCruz* (7th Cir. 1970), 420 F. 2d 1093 (police had information that the defendants were carrying drugs when the questioning was initiated); *Noel* v. *State* (Ind. Sup. Ct. 1971), 274 N.E. 2d 245 (defendant was questioned at gun point); *Commonwealth* v. *Sites* (Pa. Sup. Ct. 1967), 235 A. 2d 387 (defendant was moved from his father-in-law's home to his own home for questioning)." (Emphasis added.)

The facts in the case *sub judice* do not establish that the appellee was "in custody" or deprived of his freedom when Detective Santiago asked him the one question. There was no evidence that the appellee was restrained in any way in his movement. No "interrogation environment" was created, the detective asked one question. The appellee was not "subjected to the will of his examiner" and there was no evidence of "coercion" by Detective Santiago. Finally, the police investigation had *not* "focused on the accused." The question about the ownership of the car did not go to the element of the crime for which the appellee was indicted.

Accordingly, appellant's second assignment of error is well-taken.

The judgment on the motion to suppress is reversed.

*Judgment reversed.*

CORRIGAN, C.J., and ANN MCMANAMON, J., concur.