LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty on a trial on an indictment in pertinent part as follows:
“EMERY LEE HOWARD, alias MIKE HOWARD, whose name is to the Grand Jury otherwise unknown, did on to-wit: August 5, 1983, while at or near 1642 Mims Avenue S.W., Birmingham, Jefferson County, Alabama, unlawfully possess 27.059 grams of powder containing cocaine, a controlled substance, contrary to and in violation of the provisions of the Alabama Uniform Controlled Substances Act, in violation of Section 20-2-70 of the Code of Alabama.”
The court adjudged defendant guilty in accordance with the verdict of the jury of the crime charged in the indictment and set a date for a sentence hearing within the next six weeks approximately. At the conclusion of the sentencing hearing, the court sentenced defendant to imprisonment in the penitentiary of the State of Alabama for a term of twelve (12) years.
In the brief of counsel for appellant, a different attorney from the attorney representing defendant on the trial of the case, four issues are presented. We will consider them in the order of their presentation in the brief of appellant’s counsel.
I.
The argument of appellant’s counsel as to the first issue is thus captioned in his brief:
“The search warrant was constitutionally deficient and could not support the search of defendant’s residence.”
Prior to the introduction of any evidence in the case in the presence of the jury, a large part of the first day of the trial of this case was devoted to the consideration by the trial judge and the attorneys for the respective parties of the question of the validity of the search warrant upon which the search of defendant’s home was based, and by which search the cocaine in the case sub judice was discovered and seized. The transcript of the proceedings discloses that the search warrant was issued about seven P.M., August 5, 1983, by a judge of the Municipal Court of Birmingham and executed within an hour thereafter. The validity of the warrant and the search was challenged by motion of defendant to suppress evidence of the results of the search. It was shown at the hearing that the issuance of the warrant was largely based upon the affidavit of Sgt. Kenneth W. Williams of the Birmingham Police Department, before the particular judge who issued the warrant, and such affidavit, as typed, “subscribed and sworn before the municipal judge and signed by Sgt. Williams was and is in the transcript as follows:
“Before me, Judge of the Municipal Court of Birmingham of Jefferson County personally appeared Sgt. K.W. Williams who, after being duly sworn, upon his oath deposes and says as follows:
“ ‘An anonymous informer gave information to the Birmingham Police Department which has been received by the affiant and is as follows: that late this afternoon the gray automobile, late model, with a Florida license plate pulled into the residence of Michael Howard located at 1642 Mims Avenue. Two persons got out of the car and brought a quantity of cocaine into the residence. At this very moment, the illegal narcotics are being divided and prepared for illicit sale according to the information provided. Your affi- *1323 ant has personal knowledge that Emery Michael Howard does in fact reside at 1642 Mims Avenue and has an extensive criminal history, moreover, officers of the Birmingham Police Department have verified that the automobile described by the anonymous informant is in fact located at the premises described. Other information about the subject, Howard, which has been furnished by the anonymous caller is personally known to your affiant to be accurate and true. Further observation indicates activity in the said residence of the type and kind described by the caller. Based upon the information supplied by the anonymous caller and the corroborating observation by the Birmingham Police Personnel, I have probable cause to believe and do believe that a quantity of cocaine is presently located at the premises described above.’ ”
Three witnesses testified on the hearing of the motion to suppress, who were Sgt. Williams, Lt. Newfield, and the defendant. Some of their testimony was as to what was found in the house searched, which is not particularly pertinent to this particular issue and will be considered hereafter under Issue II. As to the issue now under consideration, it should be said to the credit of the attorneys for each of the parties in the trial court and the trial judge that they were up to date in their acquaintance with the last word of the Supreme Court as of that time in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), in replacing, by the “totality of circumstances” principle, the “two-pronged” test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 21 L.Ed.2d 23 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). It should be said also that appellant’s attorney is to be credited with studiously keeping himself abreast of the times by citing Massachusetts v. Upton, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984).
The only substantial difference between the evidence on the motion to suppress the evidence of the search and the results of the search of defendant’s residence and what Sgt. Williams had stated and verified by his oath before the judge who issued the search warrant was as to the make of the automobile with a Florida license plate that was seen at the residence of the defendant, it being shown at the hearing of the motion to suppress that the automobile was not a Thunderbird as believed by one of the surveillant officers, but was a “Chrysler product.” We are of the opinion that the trial judge correctly assayed the evidence and the law as set forth in Illinois v. Gates, supra, and Massachusetts v. Upton, supra, in determining that there was no infringement upon the defendant’s right under the Fourth Amendment of the Constitution of the United States against “unreasonable searches and seizures.” It follows that police officers of the City of Birmingham participating in the search had probable cause for believing that there was cocaine in the residence at the time. In our opinion, the municipal court judge was justified in issuing the search warrant on the basis of the affidavit and information that had been given to him by Sgt. Williams and the issue now under consideration should be determined adversely to appellant.
II.
The second issue presented is thus captioned in brief of counsel for appellant:
“WHETHER THE EVIDENCE WHICH THE JURY COULD LEGALLY CONSIDER WAS SUFFICIENT TO SUPPORT A FINDING THAT THE DEFENDANT HAD CONSTRUCTIVELY POSSESSED THE CONTRABAND.”
According to the undisputed evidence presented in the presence of the jury, which consisted exclusively of evidence presented by witnesses called by the State, as no evidence was presented by any witnesses on behalf of the defendant, between 27 and 28 grams of cocaine was found in the house that constituted the residence of defendant, and such cocaine was seized by the officers conducting the search and in due course was subjected to chemical ex- *1324 animation by a criminalist who examined it and testified that it was cocaine in the amount stated. However, the evidence is also undisputed that at no time during the search of the residence was any of the cocaine found in the actual physical possession of the defendant, that is, that none of it was found in the hands of or on the person of the defendant. Lt. Newfield and Sgt. Williams were the witnesses called by the State who testified as to what was found in the home of defendant and the circumstances as to the finding thereof. The entry made into the house was a forced entry by kicking in the front door. There were about twelve officers participating in the entry and search. According to some of the material testimony of Lt. Newfield, the following occurred:
“A. There was a living room and directly behind it was a kitchen. And from my point of view, to the right was a dining room. And as you enter the front door, there was a stair, my best recollection, going up into the living area.

“Q. Very well, sir. As I understand your testimony you and Mr. Williams and perhaps some other officers came in this way through the front door; is that correct?
“A. That is correct.
“Q. I will ask you whether or not you first saw the Defendant Mike Howard in the kitchen area; would that be true?
“A. Coming out of the kitchen area.
“Q. All right. Was he coming out of the kitchen area slowly or was he running, what was he doing?
“A. Moving pretty quick.
“Q. And in which direction was he moving?
“A. Towards the stairs going into the living area upstairs.
“Q. Those stairs there?
“A. Yes. Those stairs going upstairs, there are some bedrooms and some baths upstairs.
“Q. I take it then from your description that this is a two-story house we are talking about; is that correct?
“A. I think you would call it three because you go down stairs on the other side of the kitchen and you have got a, to the best of my recollection, there is some sort of little den or room down there and there is also an enclosed garage in that area.
“Q. But at least there was one story above the area that you entered?
“A. That is correct.
“Q. So you went in the front door, it is your testimony, that this man Mike Howard you saw running or moving quickly from the kitchen area towards that stair leading upstairs; is that correct?
“A. That’s correct.
“Q. As he did, did you have an occasion to apprehend him or did somebody else or what?
“A. Yes, sir. I hollered at the Defendant — You have to understand how we operate; we come in on a forced entry, we have weapons in hand. And the first thing you tell anybody is ‘Freeze, we are police officers.’ We identify ourselves and tell them to stop any movement and let their hands be seen so that we can determine whether they are armed or unarmed.
“Q. Did you do that?
“A. Yes, I did.

“Q. How many adult males did you find in that house when you entered it at 7:00 on the evening of August 5th, as best you recollect?
“A. Well, we determined there was one, Mike Howard is two, three; three people at that time and we later found another male in the house.. And there were several females and some children.
“Q. Now, you say later on you found another male?
“A. That is correct. 45 minutes to an hour into the search we found another black male hiding in the bathroom shower on the upper level.
“Q. The bathroom shower on the upper level?
*1325 “A. Well, I say shower, it was a tub-shower combination.

“Q. Anyway, subsequently, say 45 minutes later or so, that man was taken into custody; is that correct?
“A. That is correct.
“Q. Prior to that did you have this Defendant, and all the other people that you had seen, placed in the living room area?
“A. That is correct.
“Q. Now one of the people that you saw is a female; wasn’t she?
“A. That is correct.
“Q. All right. I will ask you whether or not you, yourself, saw her throw anything down or do anything, Lieutenant, when you went in?
“A. I saw a movement by the female but I did not see her throw anything down.
“Q. Now, in that kitchen, tell the ladies and gentlemen of the jury, this was where you saw Mike Howard run from when you first entered the house, was the kitchen area; wasn’t it?
“A. That is correct.
“Q. Where was the female?
“A. In the kitchen area.
“Q. And the male that you found some 45 minutes later was upstairs hiding in the tub?
“A. That is correct.

“Q. And how long did the search take from the time it commenced until the time it stopped?
“A. I would have to go to my recollection. I would say an hour, hour and a half.

“Q. (By Mr. Wilkinson [Asst. District Attorney]): Yes, sir. What did you see in the way of powdery cocaine appearing, looking substances that were found by officers in that house?
“A. I found — I observed two articles that had the appearance, white powder, that I considered to be cocaine, had the appearance.
“Q. What kind of containers were they in when you saw them?
“A. To the best of my recollection, little plastic containers.
“Q. Was one considerably larger than the other or were they about the same size?
“A. No, sir. One container looked like it may have contained approximately an ounce and the other container looked like maybe a gram of white powder.
“Q. Now, do you know from your own knowledge who found the larger container of cocaine?
“A. Yes, I do.
“Q. Who found that?
“A. Sgt. Ken Williams.
“Q. Do you know of your own knowledge who found the smaller packet containing the powdery substance?
“A. Yes, I do.
“Q. Who was that?
“A. Officer Jimmy Wesson.
“Q. Now, after you had observed the things that you had observed and had placed the people in the area and secured it and all the people had been located, did you take any of the individuals into custody at that time?
“A. Yes, I did.
“Q. Now, tell the ladies and gentlemen of the jury, if you will, which of the people in the house you arrested at the time and charged with violating the drug law?
“A. Mike Howard.
“Q. Anybody else?
“A. At that time — I don’t think we placed anybody else under arrest at that time, but we did Mike Howard.
“Q. Subsequently did you place anybody else under arrest?
“A. Yes, we did. It was a Jackie Brandy Austin and a Lamar Henry Parrish.
“Q. When you entered the house, if you remember, Lieutenant, how many people were in that kitchen area?
“A. It is hard to tell because as we entered the house nobody was standing still. There was a knock, there was a lot *1326 of movement, we kicked the door down and people going every direction.”
Much of the testimony before the jury of Sgt. Williams was substantially the same as that of Lt. Newfield as quoted herein-above. In addition, Sgt. Williams testified in detail as to statements made by defendant after defendant had been given adequate warnings and instructions as to his right not to make a statement. We now include some of the testimony of Sgt. Williams as to what defendant stated:
“Q. (By Mr. Nelson [Assistant District Attorney]): Was there any discussion as to the length of time that Mr. Parrish and the young lady had been at his home?
“A. Yes, sir.
“Q. What did he say in regards to that?
“A. He said ‘that they had been there for several days and that they messed up his house; that Lamar had been using— Lamar Parrish had been using his razor; that they messed up his house and didn’t help with the cooking or anything. And expected his wife to do — clean up after them and cook for them like she was some sort of a slave or something. And he was getting tired of it and he was getting ready to put them out. But he was trying to think of some nice way to do it because they were celebrities.’
“Q. Now, there has been some testimony about baking soda. Yesterday you told the Ladies and Gentlemen of the jury, you explained the various methods of the use of cocaine. And if you would, please, tell the Ladies and Gentlemen of the Jury — I think there has been some previous testimony about baking soda and lactose. If you would, explain to the Ladies and Gentlemen of the Jury the purpose of those items in regards to cocaine.
“A. Baking soda and lactose, along with mannitol, Vitamin B-12 and several other items, are used to, what they call cut cocaine or add bulk to it; for purposes of expanding the quantity so that you can retain some for yourself and then sell the rest or to expand the quantity to sell it to make a profit. In other words, if you had a gram of 100 percent pure cocaine and you added two grams of baking soda or lactose or mannitol, then you can mix it up together with real fine and you would have three grams of cocaine to sell. And thus—

“Q. (By Mr. Nelson): I show you what has been marked as State’s Exhibit No. 5 for identification and ask you if you recognize that?
“A. Yes, sir.
“Q. All right. If you would, please, tell the Ladies and Gentlemen of the Jury what that is?
“A. Mason jar that was brought to me by Officer Ben Herron, containing white powder.
“Q. Have you subsequently learned what that white powder is?
“A. We ascertain it was baking soda or baking soda like substance, with no cocaine.

“Q. (By Mr. Nelson): All right. Sgt. Williams, I showed you what has been marked as State’s Exhibit No. 4 for identification and ask you if you recognize that?
“A. Yes, sir. This is a set of tri-beam scales.
“Q. If you would, tell the Ladies and Gentlemen of the Jury what these scales are used for.
“A. They are for measuring items in gram quantities and multigram quantities.
“Q. Now, was there—
“A. There is a little plate that fits into this area here that is probably still in the trunk of my car. They are not complete, in other words.
“Q. Where was that item obtained from?
“A. This was obtained from the trunk of the car with the Florida tag on it.”
On cross-examination by defendant’s counsel, Sgt. Williams testified in part as follows:
*1327 “Q. State’s Exhibit No. 4, scales, these came from the car which had been rented by Brandy Austin?
“A. That is correct.

“Q. Now, you were aware that Mr. Howard had talked to Lt. Newfield there at Mims Avenue?
“A. Yes, sir.
“Q. That afternoon; were you not?
“A. Yes, sir.
“Q. And you later went to the jail that night to talk to him further at about 12:00?
“A. Yes, sir.
“Q. And he willingly talked to you at that time; did he not?
“A. That’s correct.
“Q. And you asked him questions about what you testified, here; have you not?
“A. That’s true.
“Q. Did you not.
“A. That’s true.
“Q. And he told you at that time, Mr. Williams, that there was no more cocaine in that house; did he not?
“A. Yes, sir.
“Q. And he told you that the only cocaine that was in that house was what Brandy Austin had?
“A. That’s correct.
“Q. What you saw her drop and what you found in her purse?
“A. Yes, sir.
“Q. And he told you again what he had told Mr. Newfield that she was there and she was fixing his hair?
“A. That’s right.
“Q. In fact she was fixing his hair on the day that you all came?
“A. That’s right.
“Q. And that Lamar Parrish and her were staying there and that he had been having some difficulty with finding a way to tell them to leave because of him being a professional football player and being a celebrity?
“A. That’s correct.
“Q. Now, regarding the plate, testimony when we talked earlier about this, this was found right up there in that same bathroom where Lamar Parrish was hiding in the bathroom?
“A. Yes, sir.
“Q. Found right there and he was hiding over there in the shower?
“A. That’s correct.
“Q. And in fact when you were asking Mr. Howard about that he told you that whatever was on that plate was what Brandy and Lamar Parrish had been using?
“A. Not exactly. He said that those were lines that they had run out for the ladies.
“Q. But that they — he said ‘Lamar Parrish and Brandy never acknowledged to you that he had anything to do with that cocaine?’
“A. In regards to the plate he didn’t mention Lamar’s name.
“Q. But he never acknowledged having anything to do with that plate?
“A. No, sir.”
The attorneys for the respective parties are apparently in substantial agreement as to the law applicable to the question whether a jury question was presented as to the guilt of defendant for the possession of the cocaine that was found in his house but as to which there was no testimony that he actually possessed. There is no quarrel by any of the attorneys with what has been held in a large number of cases in the appellate courts of Alabama on the subject since the enactment of the Uniform Controlled Substances Act, for which the courts had as guiding precedents many cases involving alleged possession of intoxicating liquor, especially during the days of nationwide prohibition. One of the most numerously cited with approval cases has been that of Rueffert v. State, 46 Ala.App. 36, 237 So.2d 520, 523 (1970), in which Presiding Judge Annie Lola Price stated the following:
“The well established rule in cases involving possession of prohibited liquors is that where actual manucaption is not shown and constructive possession is re *1328 lied upon, the state must show beyond a reasonable doubt, in addition to the constructive possession, that the accused knew of the presence of the prohibited beverages. Grimes v. State, 38 Ala.App. 94, 76 So.2d 684; Davis v. State, 40 Ala.App. 609, 119 So.2d 236.
“The rules of evidence in a prosecution for possession of marijuana are the same as those applicable in every other criminal case.
“The automobile was not in defendant’s actual possession or under his control for some time before the search. If the mere ownership of the car can be said to constitute constructive possession of the marijuana, there is still an entire failure of evidence tending to prove that defendant knew of its presence in the automobile.
“There was no testimony tending to show defendant transported the marijuana.”
In the much more recent case of Smith v. State, 457 So.2d 997 (Ala.Cr.App.1984), this Court was faced with a much more nearly apposite case than that of Rueffert v. State, supra. This Court, per Judge Harris, stated the following, at 457 So.2d 999, 1000:
“Where, as in this case, actual possession of the contraband is not shown, and constructive possession is relied upon, the State must show beyond a reasonable doubt, in addition to constructive possession, that the accused knew of the presence of the contraband. Temple v. State, 366 So.2d 740 (Ala.Crim.App.1978); Yarbrough v. State, 405 So.2d 721 (Ala.Crim.App.1981); Rueffert v. State, 46 Ala.App. 36, 39, 237 So.2d 520, 523 (Ala.Crim.App.1970). Where the accused is not in exclusive possession, this knowledge may not be inferred without other evidence that connects defendant to the contraband.
“While physical proximity to the contraband is relevant, this evidence alone does not ‘add the necessary connection’ between appellant and the contraband to show that appellant had knowledge of the presence of controlled substances. Temple, supra, at 743. But evidence of substantial control over the premises, such as the phone bill in appellant’s name, along with both verbal admissions and appellant’s conduct when she met the police officers at the door, will sufficiently connect appellant with the contraband to show constructive possession. “The circumstances as a whole were sufficient to convince the jury that appellant was more than just a mere visitor on the premises, and that she, either singly, or jointly, with the other occupant, had constructive possession of the contraband. Sturdivant v. State, 439 So.2d 184, 186 (Ala.Crim.App.1983).”
In applying what has been held in the cases cited to the facts in the instant case, in which the cocaine found and seized by the officers and constituting the cocaine identified in the indictment as the cocaine that was charged to have been in the possession of defendant-appellant, we conclude that there was substantial evidence to show that the appellant was in constructive possession of the cocaine under consideration. We are unable to determine from the evidence the period of time defendant had had knowledge of the fact that the cocaine was in his residence, but he had such knowledge before it was found and seized by the officers. Both parties on appeal seem to find some support in the undisputed testimony of Lt. Newfield on the particular point, as follows:
“I asked him [defendant] about the narcotics. And he stated that the girl, Jackie Brandy Austin, had came there and that she was giving him a hair-do. And he made motions about you could tell something about my hair. He stated that he knew that she had brought and did possess cocaine but he said ‘what did you want me to do, tell her to leave?’ And I said, ‘That is where you messed up, that’s what you should have done.’ ”
In our opinion, not to have promptly told the woman to leave his residence with the cocaine was more consistent with defendant’s guilt than with his innocence. The *1329 trial court was not in error as contended by appellant in the second issue in brief of appellant’s counsel.
III.
We now quote the caption of the third issue presented in brief of counsel for appellant:.
“THE PROSECUTION’S STATEMENTS IN CLOSING WERE SO PREJUDICIAL AS TO DENY DEFENDANT A FAIR TRIAL.”
The transcript does not contain any of the arguments to the jury of counsel for the State or counsel for defendant other than excerpts from the argument of each of the attorneys for the State to which defendant’s counsel invoked rulings of the trial court by objection or otherwise to such portions of the argument of counsel for the State. Such excerpts from the argument of counsel for the State, indication of rulings by the trial court as to such argument, and the statements made by the trial court constitute four full pages of the transcript, commencing as follows:
“(WHEREUPON, at 11:14 a.m., Mr. Nelson [Assistant District Attorney] then addressed the Jury in closing arguments for the State, at which time the following occurred:)
“MR. NELSON: And I think it is reasonable to assume ladies and gentlemen from the evidence that has been presented to you, that there was probably some selling of this material—
“MR. DODD [Defendant’s attorney]: Judge, I am going to object to that and ask for a mistrial. Your Honor has already sustained a previous objection to that. And asked the Jury to disregard it and told the prosecutor not to mention that any more. I ask for a mistrial at this time. There has been no testimony to selling. And it is highly prejudicial and is done with no other purpose than to prejudice this Jury.
“THE COURT: As you know, Ladies and Gentlemen, what the lawyers say is not evidence in the case. I do give the gentlemen some latitude in their remarks to you. But as you know, this is a possession charge. Sale of narcotics has nothing to do with this case. I will deny your motion for a mistrial, Ira. And ask you to move on to another area, please, sir.
“MR. DODD: Well, we—
“MR. NELSON: Ladies and Gentlemen, as the Judge has instructed you, certainly this is a case of possession. And I mean nothing more than the fact that these circumstances tend to point out other things. And—
“MR. DODD: Judge, he is saying the same thing and I object to it and I move for a mistrial again. And you have told him to move on.
“MR. NELSON: I am trying to move on.
“THE COURT: I will deny your motion.
“MR. DODD: We except.
“THE COURT: Any problem in the jury box about what I’m trying to tell you? This man is charged with possessing cocaine. All right? Okay. Proceed.
“(WHEREUPON, Mr. Nelson then concluded his closing remarks without further objections to exceptions taken thereto.)”
The above quoted material constitutes all that was said in open court relative to any of the argument made by Mr. Nelson. In our opinion, the trial court did not commit error prejudicial to defendant in any of its rulings contained in the quoted material. We now turn to the argument of Mr. Wilkinson, counsel for the State, which commenced as follows:
“MR. WILKINSON: And when he talked about laying out a few lines of cocaine for the ladies—
“MR. DODD: Excuse me. Your Honor, I object. There was no testimony that Mike Howard laid out any lines of any cocaine.
“THE COURT: I think there was a dialogue about the laying out of the lines, Ira. I think that is what you are talking about; isn’t it?
“MR. WILKINSON: Yes, sir, I didn’t—
“THE COURT: To the officers.
*1330 “MR. WILKINSON: I didn’t intend to say that anybody said he laid — that they were laid out, they were laid out.
“MR. WILKINSON: See, the State’s theory what we are talking about, what the judge is going to tell you about this complicity, someone deals in heroin and I—
“MR. DODD: Judge, I am going to object to any reference to heroin.
“MR. WILKINSON: Okay. Someone deals in cocaine and I opened up my house and I say ‘Come on in and stay for a few days, do whatever you want to do with your cocaine. Distribute it, take it’—
“MR. DODD: Judge, I’m going—
“MR. WILKINSON: —I invite your friends over—
“MR. DODD: —Excuse me, I am sorry I have got to object. The State has used again the word ‘distribute.’ I have objected; again, I move for a mistrial. I have asked Your Honor to instruct them, they have continued to use that allegation.
“THE COURT: I didn’t—
“MR. DODD: It is prejudicial and I ask for a mistrial again based on that. That is about the third time that that allegation has been used. And there is absolutely no testimony to it. It is done for the sole purpose of prejudicing the Jury against—
“THE COURT: I don’t see it that way. Distributing could be just giving it away to people in the home, and to so forth, Hiram. I don’t think we are talking pirating in the business; are we, Louis?
“MR. WILKINSON: No, sir.
“THE COURT: Just base your comments on the evidence. Overruled.
“MR. DODD: We except.”
The transcript of what was said and done with reference to the closing argument of the second attorney for the State continues in about the same vein as that which we have quoted above for about half a page of the transcript. Thereupon, the transcript shows the following:
“MR. WILKINSON: (Attorney’s remarks not audible.)
“MR. DODD: Judge, I object to that, to the reference to drug trafficking.
“THE COURT: Overruled. I frankly didn’t hear what you said, there was a truck out there. You were talking about the football players when I lost you.
“MR. WILKINSON: I was talking about the football — I did use the word, said you have all heard about drugs, drug use, drug trafficking, football players being in it—
“THE COURT: All right. Overruled. “(WHEREUPON, Mr. Wilkinson then concluded his final closing arguments without further objections or exceptions reserved to rulings thereupon.)”
It is unfortunate, we think, that not anyone taking part in any of the quoted colloquy gave everyone else participating therein an opportunity to complete all statement of his thoughts without interruption. Although some of the argument made by counsel for the State may have been objectionable, there was no ruling by the trial court that was prejudicial to defendant. We believe that some of the argument was objectionable, as the trial court indicated by some of its rulings. However, we are confident that the trial court did not err in overruling any effort by defendant’s counsel to obtain a mistrial and that the statements made by counsel for the State were not, as claimed by appellant’s attorney, “so prejudicial as to deny defendant a fair trial.”
IV.
As a final issue in brief of counsel for appellant, it is urged that the trial court “committed reversible error by its instructions concerning complicity, which could only have confused and prejudiced the jury, and which had no basis in evidence.” The part of the oral charge to the jury to which this issue is directed was as follows:
“Finally, I will talk with you about the law of complicity in Alabama. In order for the State to prove a Defendant guilty of a particular crime, it is not necessary that the State prove that the Defendant *1331 himself personally committed the act which constitutes the crime. Instead, in certain circumstances the law provides that a Defendant is responsible for the criminal activities of another person if the Defendant intentionally aids or abets another person in the commissions [sic] of the act constituting the offense. The words ‘aid and abet’ would include all assistance rendered by acts or words of encouragement or support or presence, either actual or constructive, with the intent to render assistance should it become necessary.
“The mere presence of the Defendant, who intends to assist with the criminal act should it become necessary, is aiding and abetting, if but only if, the one or others who actually commit the acts know of the Defendant’s presence and intent to assist.”
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All th©'Judges concur.