**STATE of Minnesota, Respondent,**

v.

**Paul Raymond VALENTO, Appellant.**

No. C0-86-1968.

Court of Appeals of Minnesota.

May 26, 1987.

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

Hubert H. Humphrey, III, Atty. Gen., Thomas Foley, Ramsey Co. Atty., and Steven C. DeCoster, Asst. Co. Atty., St. Paul, for respondent.

Paul W. Rogosheske, Thuet, Lynch, Pugh & Rogosheske, South St. Paul, for appellant.

Heard, considered and decided by PARKER, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

LANSING, Judge.

This appeal is from a conviction for possession of cocaine. Appellant claims the search warrant that led to discovery of the cocaine was issued without probable cause. He also contends the trial court denied his right to due process by forfeiting $892 that was in his possession at the time of his arrest. We affirm in part and reverse in part.

## FACTS

On July 11, 1986, Deputy Sheriff Warren John Robinson of the Ramsey County narcotics unit appeared before a Ramsey County judge to request a search warrant for 4535 Hodgson Road in Shoreview, Minnesota. Robinson's request was based

entirely on the following information in the affidavit attached to the warrant request:

Affiant received information from a Confidential Informant (CI) that the CI could purchase a quantity of cocaine from a person unknown to the CI through an Unwitting Informant (UI). Affiant has met with the CI for the purpose of buying a quantity of cocaine from the unknown person through the UI. Affiant used the following procedure: Affiant met with the CI, Affiant searched the CI for money and controlled substances and none were found, Affiant then supplied a quantity of funds from the Ramsey Co. Narcotics buy fund. Surveillance of the CI was maintained to a predetermined location where the CI met UI. A short time later the UI was observed leaving the meet location. Surveillance was maintained of the UI to 4535 Hodgson Rd, Shoreview MN, 55126 where the UI was observed entering the residence. A short time later the UI was observed leaving the residence and surveillance was maintained to a location where the CI met with the UI. A short time later the CI left the meet location, surveillance was maintained of the CI to a predetermined meet location where the CI gave me a quantity of cocaine, and at that time told me that the CI was given the cocaine by the UI. Affiant then searched the CI for monies and controlled substances and none were found. Affiant took the cocaine to the St. Paul Crime Lab for analysis and it was found to be in fact cocaine. * * *

* * * * * *

Affiant has checked with Northern States Power concerning subscriber information about 4535 Hodgson Rd, Shoreview MN 55126. NSP lists Deborah Lynn Smoyer as the subscriber for power at 4535 Hodgson * * *. Affiant checked with NW Bell security for subscriber information * * * and the number checks to a D. L. Smoyer, 4535 Hodgson Rd. Shoreview MN.

Affiant knows that the transaction described above took place within the past 72 hours.

The judge signed the search warrant in Robinson's presence on July 11. From that date until July 15, Ramsey County officers conducted intermittent surveillance outside the premises of 4535 Hodgson Road. The officers observed a car driven by appellant Paul Valento coming and going from the residence. Valento's ownership of the car was verified through a registration check. Criminal record checks on both Valento and Smoyer, who is Valento's girlfriend, revealed no prior convictions.

At about noon on July 15, 1986, deputy Robinson and another officer arrived at the home to execute the search warrant. They parked their unmarked car in front of the house and raised the vehicle's hood as though the car were broken down. The officers then knocked on the door, and a female later identified as Smoyer looked out the window and asked them what they wanted. Robinson asked to use the phone to get help with his car. Smoyer opened the kitchen door and Robinson handed her a copy of the warrant as he entered. Other officers then arrived to secure the premises.

During the search the officers found and seized a triplebeam scale that had on its weighing tray a trace amount of white powder that was analyzed and determined to be cocaine, and a "tootstraw" or "snorter" for cocaine (a cylindrical object 2–3 inches long) with a spoon. The officers also recovered a receipts ledger which contained a listing reading:

Peg    ⅛ ounce    $375

Next to the ledger was a check, with the payee's name left blank, from Peggy Hurley in the amount of $375.

The officers also found and seized the following items in various parts of the house: a sifter/grinder-type utensil with trace amounts of powder on it, several plastic bags containing trace amounts of white powder, a paper bindle (a folded piece of paper) with trace powder, a pair of black leather pants containing a bindle of cocaine in the pocket, and a bottle of Inositol (a vitamin product often used for cutting cocaine).

As the officers were conducting the search, Valento entered the premises. When he brought to the officers' attention a .357 pistol holstered under his arm, he was frisked and disarmed. Valento admitted to living at 4535 Hodgson, but refused to comment about the scale. He was then arrested for possession of the trace amounts of cocaine found on the scale. When asked whether he sold cocaine, Valento said he did not sell it, but he used about ⅛ ounce per day. When asked about the transactions recorded in the ledger, Valento allegedly responded, "I sell some sometimes." The police also confiscated $892 in cash which had been found in Valento's vest pocket.

On July 17, 1986, Valento and Smoyer were charged by complaint with possession of cocaine. At the suppression hearing prior to trial, the trial court found the search warrant was based on probable cause and that evidence seized pursuant to its execution could be admitted at trial. Valento waived his right to a jury trial and the case was submitted to the trial court based on the suppression hearing evidence, attachments to the complaint, and the criminologist's report. The court found Valento guilty as charged.

At the sentencing hearing the trial court ruled that the $892 was money received from sales of cocaine and therefore would be forfeited. Valento was sentenced to a year and a day, execution stayed, with five years probation, one condition of which was serving 45 days in the County Correctional Facility. Stay of the workhouse term pending appeal was denied by the trial court, the court of appeals and the supreme court. The trial court also refused to reconsider the forfeiture of Valento's $892.

## ISSUES

1. Did the trial court err in ruling that the facts alleged in the affidavit were sufficient to establish probable cause for the issuance of the search warrant?

2. Did the trial court err in ruling that the facts alleged in the affidavit justified granting an unannounced nighttime search?

3. Did the trial court err in ordering the money seized from Valento to be forfeited without a separate proceeding, as required by Minn.Stat. § 152.19?

## ANALYSIS

### I

■ The presence of probable cause is to be determined under a "totality of the circumstances" test:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*State v. Wiley,* 366 N.W.2d 265, 268 (Minn. 1985) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

In two previous decisions the supreme court has found sufficient probable cause in circumstances similar to this case. In *State v. Hawkins,* 278 N.W.2d 750 (Minn. 1979), the court characterized the facts as follows:

[T]he affidavit, although poorly worded, indicates (a) that the officers had participated in two "controlled purchases" within the previous 2–week period (one of the two being within the previous 72–hour period); (b) that such participation involved providing an unidentified informant with money and then observing his movements and those of his contact; (c) that the unidentified informant went to the residence of a man named Cain, who in turn went to the defendant's residence; (d) that Cain emerged from defendant's residence after only a minute inside; and (e) that Cain then gave heroin to the unidentified informant, who gave it to the officers.

*Id.* at 751.

Under those facts the supreme court found sufficient probable cause:

It is true that what the police saw during the "controlled purchase" was not enough to establish beyond a reasonable doubt that the heroin which the informant got from Cain came from within the residence, since the police were unable to search Cain before he went into the residence. Their observations, however, were sufficient to justify concluding that probably the heroin came from the residence. Stated differently, the reasonable inference which the magistrate was justified in drawing from the information provided in the affidavit was that Cain got the heroin from someone at the residence and that heroin was being kept there. Under the circumstances, we believe that the affidavit contained sufficient information obtained by independent police observation to establish probable cause.

*Id.* at 751–52.

The facts of *Hawkins* were slightly different from the facts here, because the police in *Hawkins* conducted two controlled buys at the defendant's residence, whereas there was only one controlled purchase here. However, the supreme court followed *Hawkins* in a subsequent case in which only one controlled purchase was conducted. In *State v. Aguilar*, 352 N.W.2d 395, 396 n. 1 (Minn.1984), the affidavit accompanying the search warrant request described the facts:

> Within the past 48 hrs this agent has met with a CRI [confidential informant] with the intent purpose of making a buy from the Aguilars. The CRI was observed to meet with an unwitting [participant] who was given a quantity of money and the unwitting [participant] was followed to 1628 Timberlake. He entered the residence and a short time later the unwitting [participant] was observed to come out to a car and then followed to a place where he met with the CRI. The CRI was given a quantity of suspected controlled substance which was later given to this agent. This agent field tested

this suspected substance with positive results.

Although there had been only one controlled purchase, the *Aguilar* court found that "[o]f a number of relevant cases, the one most closely in point is [*Hawkins*]." *Id.* at 396. The court went on to conclude, "[w]e believe that the affidavit in this case, although poorly worded, as was the affidavit in *Hawkins*, contained sufficient information to establish probable cause." *Id.*

■ *Hawkins* and *Aguilar* differ from the present case in one respect. In both prior decisions, the police already had reason to believe that the defendants were involved in the sale of drugs. *See Hawkins*, 278 N.W.2d at 751 n. 1; *Aguilar*, 352 N.W.2d at 396 n. 1. Here, neither Valento nor Smoyer were known to the police until the unwitting participant[1] led the officers to them. Although the argument for probable cause would be stronger had the police already suspected Valento of selling drugs, the circumstances supported a finding of probable cause even without such prior suspicions. The unwitting participant went directly to Valento's residence after being paid by the confidential informant and gave the confidential informant the cocaine immediately after leaving Valento's residence. Although there are several inferences that could be drawn from these actions, "the reasonable inference which the magistrate was justified in drawing from the information provided in the affidavit was that [the unwitting participant] got the [cocaine] from someone at the residence and that [cocaine] was being kept there." *Hawkins*, 278 N.W.2d at 751–52.

■ Finally, great deference must be given to the issuing judge's determination of probable cause. *See Wiley*, 366 N.W.2d at 268. As the United States Supreme Court has stated:

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be

---

1. We note and adopt the State's use of the phrase, "unwitting participant," rather than the phrase, "unwitting informant," because the word "informant" implies the intentional passing of information.

paid great deference by reviewing courts." "A grudging or negative attitude by reviewing courts toward warrants" is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner."

*Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (citations omitted).

In light of this deferential standard of review and the previous decisions discussed above, we hold that the facts alleged in the affidavit were sufficient to establish probable cause for the issuance of the search warrant.

## II

Valento also claims the affidavit was insufficient to support an unannounced, nighttime search and that the warrant was therefore invalid. In the affidavit deputy Robinson requested an unannounced search because his "past experience in executing narcotics search warrants has shown that attempts are inevitably made to destroy evidence and/or interfere with the executing officers when preannounced presence of the police is known."

In *State v. Parker,* 283 Minn. 127, 136, 166 N.W.2d 347, 353 (1969), the supreme court set forth the rule for permitting unannounced searches:

In summary, we hold that where the affidavit in support of a petition for a search warrant sets forth "exigent circumstances" with sufficient particularity to justify dispensing with the necessity for announcing authority and purpose, and the issuing magistrate includes in the search warrant specific authority to enter the premises without such an announcement, the entry is lawful and evidence thus obtained is not inadmissible on that account. Where the evidence presented to the issuing magistrate discloses facts which are reliably documented and furnish the magistrate with a substantial basis for believing that an

announcement will result in the destruction of evidence, the magistrate is authorized to include in the warrant authority to dispense with the announcement.

Specifically addressing unannounced searches in relation to narcotics cases, the *Parker* court quoted a Maryland case:

Practicalities and exigencies in searches for narcotics require the element of surprise entry, for if opportunity is given all evidence easily may be destroyed during the time required to give notice, demand admittance and accept communication of denial of entry. As one commentator said:

" * * * [I]t would seem that the perfection of small firearms and the development of indoor plumbing through which evidence can quickly be destroyed, have made [statutes requiring notice and entry before the use of force to enter] * * a dangerous anachronism. In many situations today * * *, a rule requiring officers to forfeit the valuable element of surprise seems senseless and dangerous."

*Id.* at 135, 166 N.W.2d at 352 (quoting *Henson v. State,* 236 Md. 518, 523, 204 A.2d 516, 519 (1964)).

In *State v. Lien,* 265 N.W.2d 833, 838–39 (Minn.1978), the supreme court further articulated the standard for unannounced searches:

First, when police seeking a search warrant have reason to believe that an unannounced entry will be required in order to successfully and safely execute the warrant, they must inform the issuing magistrate of the circumstances which they believe justify the unannounced entry and obtain specific advance authorization for it.

Second, in order to obtain such authority the police must make a strong showing that an announced entry will result in the destruction of evidence or in danger to the officers in executing the warrant.

a. In this regard, the officer must do more than simply make a showing that drugs are involved. In fact, we question whether an unannounced entry clause can ever be justified in a warrant to

search a dwelling for drugs when there is no indication that the drugs are other than for personal use and where there is no averment of specific facts indicating that an unannounced entry is needed in order to safely and successfully execute the warrant.

b. However, if the affidavit contains a showing of necessity—e.g., a showing that the occupants are prepared to destroy evidence whenever the search warrant is executed or that the dwelling is being used also as an outlet or a warehouse for a drug business—then the request for the unannounced entry clause should be granted.

The third governing principle is that even if police obtain advance judicial authorization for an unannounced entry into a dwelling, the police still should make a threshold reappraisal of the need to execute the warrant in this manner.[2]

■ Here the requirements were met. First, the police informed the issuing magistrate of the circumstances which they believed justified the unannounced entry and obtained specific advance authorization for it. Second, the affidavit contained a showing of necessity in that its description of the circumstances, including the controlled purchase, indicated that the home was being used as an outlet for drug business. Third, the police made a threshold reappraisal of the need to conduct an unannounced entry and decided instead to use a "ruse," which was safer than a traditional unannounced entry because it decreased the possibility of a hostile, and potentially dangerous, reaction by those inside the premises.

In *State v. Prudhomme,* 287 N.W.2d 386, 389 (Minn.1979), the supreme court discussed the purposes served by the notice requirement. The court, citing 2 W. LaFave, *Search and Seizure* § 4.8(a) (1978), determined:

These purposes include, (a) preventing the unnecessary destruction of the property of the person whose dwelling is entered, (b) protecting innocent people by minimizing the chances of entry of the wrong premises by mistake, (c) protecting people against unnecessary shock or embarrassment connected with unannounced entries, and (d) decreasing the potential for a violent response by the occupant which might not otherwise occur if the occupant knows that the people seeking entry are police who have a warrant.

Here, as in *Prudhomme,* "the action of the police did not seriously offend any of the purposes served by the notice requirement." *Id.* There was no damage to property caused by the police action. The infringement upon any reasonable expectation of privacy was minimal, since the police did not burst into the house. The action of the police did not have any greater potential for causing unnecessary shock or embarrassment than an ordinary execution of a warrant. Finally, the entry under the circumstances was not likely to provoke a violent response. Therefore, we hold that the unannounced search was permissible.

■ As to the warrant's authorization of a nighttime search, the police here declined to take advantage of that authorization and instead conducted their search at midday. The warrant's authorization of a nighttime search, therefore, had no effect on Valento, let alone an adverse effect of constitutional dimensions.

### III

The final issue on appeal is the disposition of the cash in Valento's possession at the time of his arrest. The trial court ordered the money forfeited during the following exchange during Valento's sentencing hearing:

MR. POCH [representing the County Attorney's Office]: Does the court wish to address the money seized?

---

**2.** *Lien* also articulated a fourth requirement, but it applies only in cases where the "police have no reason to seek advance authorization or if advance authorization is denied." *Id.* This requirement does not apply here because the police received advance authorization for the unannounced search.

THE COURT: Yes, I think I should. The $821 [sic], at least it would appear in the court's judgment, to be money from sales of cocaine and, consequently, that will be forfeited.

MR. ROGOSHESKE [representing Valento]: Judge, pursuant to that, we hadn't addressed that previously because the county attorney's office usually files a forfeiture action. My client would have been in a position to show proof that a large part of that money were checks that he cashed from his employment and he had some pay stubs. I would ask the court to stay any action on the forfeiture and ask the county attorney's office to proceed as they normally do on a civil suit as opposed to shortcutting the matter.

THE COURT: I don't see any reason for that. I don't see the necessity for that. I'd entertain a petition, if you think there's some reason you could change my mind, but I don't think there's any necessity for the county attorney's office to go to the problem of a civil forfeiture.

Valento's attorney then submitted a petition, in the form of a letter to the trial court, explaining the existence of the $892:

Had testimony been heard, it would have been shown that the money found on the person of the defendant was earned by completely legitimate labor. Enclosed is a copy of a check from the L'Allier Construction Company in the amount of $650.00 and a receipt for payment from Scott Freeman for another $360.00. Mr. Valento had the $650.00 in cash from the check and the $360.00 in cash from Mr. Freeman at the time of the search, and it is that money that was found. These were legitimate monies received for legitimate labor and not subject to forfeiture.

The trial court responded simply by writing, "Petition is denied" on the letter and sending it back to Valento's attorney.

The trial court clearly failed to adhere to the mandatory procedures set forth in Minn.Stat. § 152.19, subd. 5 (1986):

Property shall be forfeited after a conviction deemed to be a felony according to the following procedure:

(1) A separate complaint shall be filed against the property describing it, charging its use in the specified violation, and specifying the time and place of its unlawful use.

\* \* \* \* \* \*

The language of § 152.19 is not discretionary; it is mandatory. The statute provides that property *shall* be forfeited according to the specified procedure, and that a separate complaint *shall* be filed. Moreover, at least under the federal forfeiture statute, 19 U.S.C. § 1615, the burden of proof is on the government to show probable cause for the institution of a forfeiture suit. *United States v. Thirteen Thousand Dollars in U.S. Currency*, 733 F.2d 581, 584 (8th Cir.1984). Here, there has been no showing whatsoever that the $892 found on Valento was received from sales of narcotics.

"[F]orfeiture provisions are punitive in effect and are subject to careful scrutiny by the Court." *United States v. One 1970 Buick Riviera, Serial No. 949870H920701*, 374 F.Supp. 277, 279 (D.Minn.1973) (construing the federal forfeiture statute). The forfeiture was accomplished in direct contravention of the clear language of the state forfeiture statute and must be reversed.

### DECISION

We affirm the trial court's ruling that the facts alleged in the affidavit were sufficient to establish probable cause for the issuance of the search warrant authorizing an unannounced nighttime search. We reverse the trial court's forfeiture order because it did not comply with the mandatory requirements of Minn.Stat. § 152.19.

Affirmed in part and reversed in part.