STATE of Minnesota, Respondent,

v.

Timothy Gene AILPORT, Appellant.

No. C2-86-2202.

Court of Appeals of Minnesota.

Sept. 15, 1987.
Review Denied Nov. 18, 1987.

Paul W. Rogosheske, Thuet, Lynch, Pugh & Rogosheske, South St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey Co. Atty., Steven De-Coster, Darrell C. Hill, Asst. Ramsey Co. Attys., St. Paul, for respondent.

Heard, considered and decided by RANDALL, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

SEDGWICK, Judge.

Timothy Ailport was arrested when a warranted search of his residence uncovered drugs, drug paraphernalia, money, and weapons. Ailport was charged with possession of methamphetamine with intent to distribute in violation of Minn.Stat. § 152.09, subd. 1(1) (1986).

A pretrial evidentiary hearing was held October 2 and the court, after an *in camera* hearing, denied appellant's motion to suppress evidence seized as a result of the search. The court also protected a confidential informant's identity.

Appellant was found guilty after trial to the court upon stipulated facts. He claims the search warrant lacked probable cause, that a no-knock nighttime entry was not justified and that the limits placed on the cross-examination of Deputy Robinson to protect a confidential informant denied him his constitutional right to confront witnesses against him. We affirm.

## FACTS

On July 3, 1986, Deputy Warren Robinson, Jr., of the Ramsey County Sheriff's Department, obtained a search warrant for the upstairs apartment at 858 Payne Avenue, St. Paul. Deputy Robinson's affidavit essentially made the following points: His law enforcement experience; the details of a controlled purchase of methamphetamine by a confidential informant through an unwitting informant within the past 72 hours; Dale Ailport, Sr., and Timothy Ailport were utility subscribers at the location of the buy; Dale, Sr., had been arrested in the past several months for possession of a "large amount of methamphetamine"; and information from the confidential informant that Dale, Sr., as a major dealer, and his sons, including Timothy, helped transport and sell the controlled substances.

Robinson's affidavit also stated:

Affiant knows that when the [unwitting informant] left 858 Payne Ave. that visual surveillance of the vehicle was lost for a period of 4.5 min. Audible surveillance was maintained and the [unwitting informant] did not meet with anyone nor exit the vehicle during this period of time. Affiant knows based on training and experience that it is common that persons buying controlled substances for other persons will stop along the return route making the delivery and chip or take a portion of the substance for themselves and replace the substance with a cut or look alike substance.

Ailport argues that audio surveillance was maintained only through use of an illegal "bug" and that the evidence obtained under the search warrant should be excluded. The evidence included: 15 quarter-inch squares of LSD; a glass vial containing cocaine; a make-up case with cocaine; a plastic bag of methamphetamine; some cash and a check made out for cash; razor blades and a cutting mirror; and a stun gun and switchblade.

Robinson's affidavit requested a nighttime as well as a no-knock search based on virtually identical language. No-knock entry was sought because "[a]ffiant's past experience in executing narcotic search warrants has shown that attempts are inevitably made to destroy evidence and/or interfere with the executing officers when preannounced presence of the police is

known." A nighttime search was justified by the same recital, coupled with the statement that "[a]pproach to and entry of the residence can be made more safe for the officers under the cover of darkness." The police executed the warrant at 8:50 p.m. on July 3, after a short surveillance where they observed people entering and leaving the apartment.

## ISSUES

1. Was the search warrant supported by probable cause?

2. Was there sufficient justification for a nighttime no-knock entry?

3. Were Ailport's constitutional rights violated by the limitations placed on cross-examination of the police officer in order to protect the identity of the informants?

## ANALYSIS

### I.

■ The propriety of a magistrate's decision to issue a search warrant must be evaluated under the "totality of the circumstances" test as expressed in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*State v. Wiley*, 366 N.W.2d 265, 268 (Minn. 1985) (quoting *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332).

The magistrate's decision to issue a warrant is entitled to deference, and the reviewing court should determine whether a "substantial basis" exists for probable cause rather than undertake an exacting *de novo* review of the evidence. *Massachusetts v. Upton*, 466 U.S. 727, 732–33, 104 S.Ct. 2085, 2087–88, 80 L.Ed.2d 721 (1984). *Upton* explicitly rejected Ailport's argu-

ment that the old *Aguilar* and *Spinelli* test are applicable to his situation:

> We did not merely refine or qualify the "two pronged test." We rejected it as hypertechnical and divorced from "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

*Id.* at 732, 104 S.Ct. at 2087 (citation omitted).

The court must make an assessment of the probability that contraband might be located based on the totality of the evidence. *See Gates*, 462 U.S. at 232–33, 103 S.Ct. at 2329–30.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same— and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*Id.* at 231–32, 103 S.Ct. at 2328–29 (citation omitted).

The police surveillance of the unwitting informant from the Ailport apartment to a predetermined location was interrupted for 4½ minutes. Deputy Robinson stated that audio surveillance revealed that the informant met with no one during the 4½ minute gap. We have reviewed the *in camera* testimony of Deputy Robinson and are satisfied that the state did not engage in any illegal activity in connection with the audio surveillance.

The affidavit presents evidence comparable to that in *State v. Valento*, 405 N.W.2d 914 (Minn.Ct.App.1987). A single controlled purchase through a confidential informant and an unwitting informant provided probable cause for a warrant even in the absence of any other supporting information that the drugsellers were actively involved in the trade. The decision rested on the similar case of *State v. Aguilar*, 352 N.W.2d 395 (Minn.1984), where only a sin-

gle controlled purchase provided probable cause, and *State v. Hawkins,* 278 N.W.2d 750 (Minn.1979), in which two buys within two weeks provided probable cause. Both cases involved the use of confidential informants operating through unwitting informants.

We cannot distinguish Ailport's situation based solely on a short gap in visual surveillance where the legal, audible surveillance was, as described here, a reasonable substitute. The trial court made a common-sense decision based upon the total circumstances in the affidavit which demonstrated a "fair probability that contraband or evidence of a crime will be found in a particular place." *Wiley,* 366 N.W.2d at 268 (quoting *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332).

## II.

Deputy Robinson requested in his affidavit that a no-knock, nighttime entry be approved because announcements provide time for drugs to be concealed or destroyed or for individuals to resist the officers' entry, and it is safer for police to approach a residence under the cover of darkness.

In *State v. Lien,* 265 N.W.2d 833 (Minn. 1978), the Supreme Court enumerated the following principles governing the unannounced entry of a dwelling place to execute a search warrant:

1. Police must have reason to believe that an unannounced entry is required to execute the warrant safely and successfully, must inform the issuing magistrate of facts justifying unannounced entry, and obtain advance authorization for it.

2. Police must make a strong showing that an announced entry will result in destruction of evidence or danger to officers.

a) When there is no showing that drugs are other than for personal use and no showing of specific facts that the officers' safety would be jeopardized, it is unlikely an unannounced entry could ever be justified.

b) However, if the affidavit shows necessity—for example, the occupants are pre-

pared to destroy evidence or the dwelling is also being used as an outlet or warehouse for a drug business—the request for unannounced entry should be granted.

3. Even when permission for no-knock is granted, police still should make a threshold reappraisal of the need to execute the warrant in this manner.

4. If police have no reason to seek advance authorization, or if such authorization is denied, the police still may make an unannounced entry to execute the warrant if facts arising at the threshold strongly indicate an unannounced entry is necessary to execute the warrant safely or successfully. *Id.* at 838–39.

*Lien* also considered the issuance of warrants for nighttime searches. Minn.Stat. § 626.14 (1986) requires daytime searches unless the affidavits show that a nighttime search "is necessary to prevent the loss, destruction, or removal of the objects of the search." The statute was read to "require * * * some showing to the magistrate that the warrant can only be executed successfully in the nighttime." 265 N.W.2d at 840.

The statements provided by Deputy Robinson were generalizations based on his experience and were not fact-specific. "Attempts are inevitably made to destroy evidence and/or interfere" and with regard to a nighttime search, the deputy related that the cover of darkness provided greater safety. We are concerned that while *Lien* requires strong showings of necessity, in reality it appears that police often provide boiler-plate language. For example, in *Valento,* Deputy Robinson was the affiant seeking a search warrant 8 days after the search of Ailport's apartment and his language in justification of an unannounced search in *Valento* was virtually identical to that in this case.

Here, however, the deputy's affidavit indicated that the dwelling was "being used as an outlet * * * for the drug business" which brings it within 2b of *Lien*'s principles justifying an unannounced entry. The police also made a brief threshold re-evaluation as required and executed the warrant

at a reasonable hour when most people were still awake.

We also note that the exclusionary rule is directed at *police* misconduct. Where police, as they did here, act in good faith by going to a magistrate and relying on the magistrate to make a determination of probable cause, we would not deter police misconduct, but would punish good police conduct, by applying the discretionary rule. *State v. Buchholtz*, 295 N.W.2d 629, 632 (Minn.1980); *State v. Velishek*, 410 N.W.2d 893 (Minn.Ct.App.1987).

Under the totality of circumstances, there was probable cause for the issuance of the warrant.

### III.

The sixth amendment of the Constitution guarantees the right to confront and cross-examine witnesses. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). Normally, the scope of cross-examination rests largely in the discretion of the trial court. *See State v. Jones*, 381 N.W.2d 44, 47 (Minn.Ct.App. 1986). The trial court could properly limit cross-examination to protect the identity of the informants. But,

> [i]f a defendant has presented sufficient evidence to challenge the veracity of an affidavit executed to obtain a search warrant, he is entitled to some form of disclosure of an informant's identity if he can establish that such disclosure is necessary to complete his evidentiary attack on the supporting affidavit.

*State v. Luciow*, 308 Minn. 6, 13–14, 240 N.W.2d 833, 839 (1976).

Deputy Robinson used an electronic listening device during the controlled purchase. This was placed on the confidential informant with his consent. It is not illegal to use an electronic monitoring or recording device without a warrant when one party has consented to such use. *State v. Olkon*, 299 N.W.2d 89, 102–103 (Minn.1980), *cert. denied*, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). Therefore, there was no illegal conduct used to establish probable cause.

This case is factually indistinguishable from *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), where police placed a monitoring beeper inside a container of chemicals which was being transported by auto to the defendant's cabin, a suspected drug-manufacturing establishment. The car, driven and belonging to a co-defendant, was followed on the public highways by both visual and beeper surveillance. In response to the cabin owner's fourth amendment challenge, the court held that the monitoring beeper signals did not violate the defendant's constitutional rights because he did not have any legitimate expectation of privacy which had been invaded. *Id.* at 285, 103 S.Ct. at 1087.

There was no abuse of discretion by the trial court.

### DECISION

Affirmed.