Filed 5/22/25  P. v. Thorpe CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B330878 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA149698) |
| v. | |
| CHARLES EDWARD THORPE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

On July 30, 2019, police went to defendant Charles Edward Thorpe's apartment after receiving information that a dead body was hidden in his bedroom closet. Before entering the residence, police telephoned Thorpe, who said he was not home but would return there to meet the officers. When Thorpe failed to show up, officers entered the apartment without a warrant. Inside the apartment they found Thorpe; inside Thorpe's bedroom closet they found the body of Tracey Castle secreted inside a barrel. Police then obtained a search warrant, which led to the seizure of evidence including blood stains from the victim elsewhere in the apartment and that Thorpe made numerous Internet searches relating to committing murder and how to dispose of a body.

The People charged Thorpe with the first degree murder of Castle. (Pen. Code,[1] § 187, subd. (a).) A jury found Thorpe guilty as charged and the court sentenced him to 25 years to life in prison.

Thorpe's appeal focuses solely on whether the trial court erred in denying his motion to suppress evidence obtained through the search warrant. The trial court found the initial warrantless search improper but concluded that after excising information obtained during that warrantless entry from the affidavit in support of the search warrant, the affidavit still established probable cause. We agree and also reject several other arguments Thorpe makes regarding the warrant. Accordingly, we affirm.

---

[1] Unspecified statutory references are to the Penal Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

## A.    The Searches

In the early morning hours of July 30, 2019, Kelina McNeil contacted police.  She reported that Thorpe, whom she identified as her ex-boyfriend, had told her approximately four days earlier that he had a dead body in his apartment and wanted her to help dispose of it.  Police went to Thorpe's apartment, but no one answered the door.  Police were able to contact Thorpe on his cell phone, and he indicated he was not home but would meet them at his apartment.  When Thorpe failed to appear after nearly two hours, police decided to enter the apartment without obtaining consent or a warrant.  Inside they found Thorpe and a dead body in a container in the bedroom closet.  Upon making this discovery and taking Thorpe into custody, police exited the apartment to seek a search warrant.

Los Angeles Police Department (LAPD) Detective Dominic Evans applied for a search warrant that same day (July 30, 2019).  The application requested permission to search Thorpe's apartment and to seize data and communications contained in his cell phone.

Evans's statement of probable cause in support of the warrant recounted the information initially provided by McNeil, stating she was Thorpe's ex-girlfriend and Thorpe had told her that "three to four days ago" "he had killed an elderly female for her 2003 red Porsche."  Evans relayed that McNeil had told police that Thorpe lived at the apartment with his current girlfriend and was "believed to have violent behavior and a domestic violence report against him."  Evans recounted that patrol units went to the apartment "to ascertain the condition of the potential victim, however patrol units were unable to make contact with

3

any occupants." At approximately 7:00 a.m., LAPD Detective Oscar Villarreal had a follow up discussion with McNeil, who "stated that she is in a relationship with . . . Thorpe. Last week (unknown exact date or time) while in the suspect apartment Thorpe advised her that he has a dead body in the apartment . . . and he needed her assistance in disposing the body. He stated the body was concealed in a drum in his closet bedroom. While inside Thorpe's bedroom, McNeil saw a large brown cardboard box located inside [the] bedroom closet. Thorpe said that the body was inside the box." Evans further declared that, "During this conversation with McNeil, Villarreal called Thorpe on his cellular telephone number . . . , which was provided by McNeil. Thorpe answered his cellular telephone" while "officers contained the residence." Ten minutes later, "as officers were outside [the apartment] attempting to have the occupants exit, Thorpe contacted [LAPD] using his cellular number . . . and said his name as Charles. He said he wasn't at his residence but would drive there from Long Beach in order to meet officers. Thorpe never arrived at the residence." At approximately 9:00 a.m., officers "forced entry into the residence in order to render aid to the victim possibly located in the residence. Upon entry to the bedroom officers observed Thorpe lying facedown on the bed and [he] was taken into custody without incident. Upon further search of the residen[ce], officers detected a strong odor of incense within the bedroom. Officers opened the bedroom closet door and observed a large cardboard box with a sheet over . . . the top. After opening the cardboard box, officers located a cardboard drum (55[-]gallon type). The cardboard drum contained a large plastic bag which contained a body." The magistrate issued the

4

warrant as requested, and police conducted the searches authorized by it.

## B.     Thorpe's Initial Motion to Suppress

On September 24, 2019, Thorpe filed a motion pursuant to section 1538.5 to suppress evidence seized from his apartment as a result of the warrantless entry and search, as well as from the later search pursuant to the warrant.  Thorpe contended the warrantless search violated the Fourth Amendment because there were no exigent circumstances given that McNeil had reported the victim was already dead and officers had no evidence that anyone else was in danger.  He also contended there was no need for emergency action to avert the destruction of evidence as the officers did not enter Thorpe's apartment until five hours after McNeil's initial call and, thus, had sufficient time to obtain a warrant.  Thorpe further contended that the later-obtained warrant was invalid because it was based on information gathered during the initial, illegal warrantless search.  The People opposed the motion.

On October 18 and 22, 2019, the court (Judge John J. Lonergan) held a combined preliminary hearing and evidentiary hearing on the motion to suppress.  Janae Harris, Thorpe's girlfriend, testified she had been in a relationship with Thorpe since June 2019.  She was aware Thorpe was previously involved with a woman she knew as "Sunny" who was pregnant with Thorpe's child; other evidence established "Sunny" was McNeil. On July 28, 2019, McNeil called Harris and said she was done with Thorpe and there was a body in the closet of his apartment; Harris then hung up the phone.  Harris called Thorpe to report what McNeil had said, and Thorpe told her to disregard McNeil's claim.

5

McNeil also testified. She said that sometime in mid-July 2019, Thorpe asked her to help him rob a woman for her car, and McNeil told him no. A couple of days after this conversation, on July 23, 2019, Thorpe picked McNeil up in a red Porsche that she had never seen before. They drove to downtown Los Angeles to buy luggage which Thorpe said was for a body. Thorpe said this "jokingly" so McNeil "was just hoping it was a joke."

The following day, July 24, Thorpe told McNeil there was a female body in his apartment. Thorpe said the dead woman had been robbed for her car but gave differing accounts of his involvement in the robbery. Thorpe told McNeil to stay away from the bedroom where the body was, showed her a barrel in the bedroom, and told her that was where he was keeping the body. McNeil called Harris that same day and told her what Thorpe had said; she was hoping Harris would go with her to see if there was a body in the apartment.

McNeil said Thorpe told her that he wanted to dump the body in a field. McNeil searched for places to dispose of the body and gave Thorpe ideas, but said she did not have any intention of helping him further. She explained that "[she] was acting like [she] was going with him wherever he was going, but just to know where he put the body at basically." McNeil did not call the police at that point because she had previously dealt with a situation where someone who was guilty of a crime was released, and she "was just being careful."

McNeil decided to call the police after learning, on July 29, 2019, that Thorpe had taken Harris to a fashion show the previous day. When asked whether she was jealous of Harris, McNeil stated, "No, not exactly. Just a little creeped out . . . [b]ecause I talked to her about it days before and then she's kind

6

of stalking him at the fashion show." McNeil explained that she decided to call the police "[b]ecause the day we were supposed to go into the field or wherever we were going, I looked into his text messages and he was inviting her over so I was just like—I was like maybe I'm in danger." McNeil "already felt like [she] was in danger, but even more in danger because [she] thought that [Harris] had something to do with it also."

McNeil called the police at around 4:00 a.m. on July 30, 2019, because she felt that she and others were in danger. When McNeil called the police, she stated that there might be a dead body at her friend's house. She later spoke in person to an LAPD officer and reported that Thorpe had told her a couple of days before that he may have a dead body at his house. She told the police that she thought Thorpe might have been joking with her because he told her several different stories. When asked whether she told police that she called because Thorpe was spending time with another woman, McNeil responded, "[n]ot exactly, but that may have been the first thing that I said." McNeil explained, "[i]t was the fact that I had already spoke to [Harris] and then that [Harris] was, like, there so I was, like, are they both trying to play me[.] Were they trying to kill me or set me up for something that they already did together?"

Detective Villarreal testified that he interviewed McNeil at the police station around 7:00 or 8:00 a.m. on July 30, 2019. McNeil reported that Thorpe, her boyfriend, had told her a couple of days earlier that he had killed a woman, the body was inside his residence, and he needed her help to dispose of the body. McNeil reported that Thorpe told her the victim was an elderly female. McNeil told Villarreal that she had not seen a dead body, did not witness a murder, and was not sure whether there was a

7

dead body in the apartment. Villarreal called Thorpe using the number provided by McNeil. When Thorpe answered, the detective identified himself and told Thorpe about the allegations against him. Thorpe said that he was in the Long Beach area at least half an hour away and would come home. After the call ended, the LAPD communications division informed Villarreal that Thorpe had called them, and analytics showed his phone was located in the area of his residence (which was not in Long Beach). This led Villarreal to conclude that Thorpe had lied about not being at home. Based on his training and experience, Villarreal believed that it was necessary to enter Thorpe's apartment to verify whether there was a victim inside in need of medical assistance. After interviewing McNeil, Villarreal went with her to Thorpe's apartment, and she identified Thorpe as he was being brought out.

According to LAPD Detective Nathan Kouri, an LAPD sergeant decided the police would enter the apartment without a warrant. Once inside, officers discovered human remains inside a barrel. Kouri ordered them to stop what they were doing and exit the residence until they obtained a warrant.

Detective Evans testified that when he arrived at the apartment on the morning of July 30, 2019, he was informed that there was a body inside the residence. He drafted an affidavit for a search warrant. The warrant was signed by the magistrate at about 2:00 p.m.

At the conclusion of the hearing, the court denied the motion to suppress. It concluded that exigent circumstances excused the police from obtaining a warrant because they believed there might be a person in need of medical attention in the apartment, and also because Thorpe could have destroyed

8

evidence. The court then held Thorpe to answer for the murder charge.

## C.     The Renewed Motion to Suppress

On November 19, 2019, Thorpe filed a renewed motion to suppress all evidence seized from his apartment based on the evidence adduced at the prior motion to suppress hearing. (§ 1538.5, subd. (i).)[2] Thorpe argued that police had adequate time to obtain a warrant before entering his apartment. He further argued there were no exigent circumstances because McNeil reported the possibility of a dead body, not a living victim. Thorpe challenged the court's earlier finding that the warrantless entry was justified to prevent the destruction of evidence by pointing out that none of the officers testified they were concerned about potential destruction of evidence.

The trial court (Judge Michael Shultz) heard the renewed motion on December 16, 2019. In addition to the evidence from the initial suppression hearing, Evans testified regarding his preparation of the affidavit in support of the search warrant. Kouri testified regarding the decision to enter the apartment without a warrant. Based on the evidence before it, the court found that the officers' July 30, 2019 warrantless entry into the apartment was unlawful and not justified by exigent circumstances. The court nonetheless largely denied Thorpe's motion, finding that the affidavit, with the information obtained

_____

[2] Pursuant to section 1538.5, subdivision (i), a defendant who has been held to answer for a felony and who has made a motion to suppress which was ruled on at the preliminary hearing "shall have the right to renew" the motion "at a special hearing relating to the validity of the search or seizure."

9

from the warrantless search redacted, supplied probable cause to search.  The court thus suppressed evidence that was obtained during the warrantless entry and not also obtained during the later entry pursuant to the warrant, including that the police found Thorpe in his apartment.

## D.    Trial

The jury heard evidence on five days from August 2 to 9, 2022.  We summarize below key evidence introduced at trial that was obtained via the search warrant.

### 1.    *Castle's Body*

An LAPD criminalist testified that on July 30, 2019, while inspecting Thorpe's apartment, he found a large cardboard barrel in the back of the bedroom closet.  The barrel was moved outside, and the coroner opened it and found a body inside a black trash bag.  The jury was shown photographs of the body, authenticated by the criminalist.  The parties stipulated that the body was Castle.

A deputy medical examiner testified that she performed an autopsy of Castle's body on August 2, 2019.  By that time, the body was already severely decomposed.  The deputy medical examiner determined the cause of death to be multiple sharp force injuries; she found 27 sharp force wounds on the body, including five that were fatal or potentially fatal, meaning they could have led to a relatively rapid death.  She also noted injuries on Castle's right hand which were consistent with defensive wounds.

## 2. *Additional Evidence Connecting Thorpe with the Killing*

While inspecting Thorpe's apartment, the LAPD criminalist found blood stains on the bathtub, a door frame, the bedroom floor, a bedroom wall, the bottom of the closet door, a pole in the bedroom, and a light switch in the bathroom. A second LAPD criminalist testified that a DNA analysis showed Castle could have been a source for the blood stains found on the closet door and a wall in Thorpe's bedroom, and on the light switch in the bathroom, while Thorpe and McNeil were excluded as potential sources.

The first LAPD criminalist testified that, when he found the barrel in the bedroom closet, it was wrapped in green plastic wrap that matched wrap located in a container in the kitchen. He also testified that he found cleaning supplies and latex gloves in the apartment.

## 3. *Castle's Porsche*

After Castle was identified as the victim, police investigated whether she owned a red Porsche. An auto dealership employee authenticated a sales document showing Castle bought a red Porsche at the dealership on July 14, 2019. The dealership put a tracking device on the vehicle, and a report was introduced showing the vehicle's location on various dates. According to the report, the Porsche was taken from the dealership to Los Angeles between July 14 and 22, was in Los Angeles on July 24 and 25, and was at a location in San Diego on July 28 and 31, 2019.

An auto mechanic in San Diego testified that on or about July 27, 2019, Thorpe brought a red Porsche to him and asked whether the vehicle had GPS and, if so, how to uninstall it.

11

Thorpe also asked if the mechanic could help sell the vehicle. The mechanic told Thorpe he did not know how to get rid of the GPS and could not help sell the vehicle. During this meeting, Thorpe appeared very nervous and was pacing back and forth while on his phone.

  4. *Cell Phone Information*

  An LAPD detective authenticated an extraction report setting forth various data seized from Thorpe's cell phone pursuant to the warrant. The report showed Thorpe and Castle exchanged text messages on July 15, 2019, in which they discussed their romantic relationship. On July 16, 2019, Castle texted that she was coming to Los Angeles to see Thorpe. Just after midnight on July 21, 2019, Thorpe texted Castle accusing her of being with another man. Castle responded later that morning, denying that she was involved with another man. According to the text messages, Castle arrived in Los Angeles in the evening on July 21, 2019, and Thorpe was on his way to meet her. There were no texts from Castle on or after July 22, 2019.

  On July 22, 2019, McNeil sent videos to Thorpe showing the inside of a Porsche.

  On July 23, 2019, Thorpe sent an unknown person an image of a certificate for Castle's Porsche that contained the car's unique vehicle identification number (VIN). Thorpe indicated in following texts that he wanted to sell the vehicle.

  The report also listed user Internet searches done through Thorpe's phone. On July 3, 2019, there were searches for "will murder put in hell" and similar topics. On July 19, 2019, there were searches for methods to kill a person, including "knife wounds that instantly kills you." On July 21, 2019, there were searches for ways to kill a person, and the impact on a person's

life of committing a murder. On July 22, 2019, there were searches related to disposing of a body, including "what happens when you burn a body" and "bodies in Las Vegas desert." On July 23, 2019, there were searches regarding the value of a 2003 Porsche 911 and the location of VINs on that type of vehicle, searches for methods to dispose of a body, what happens to bodies after death, and several variations on "how to get away with murder." On July 24, 2019, there were searches regarding burning bodies, acid, "55-gallon drum near me," and how to avoid having a dead body smell. There were additional searches about how to dispose of a body through July 29, 2019.

## DISCUSSION

Thorpe contends, as he did before the trial court, that once one excises the information obtained from the warrantless search from Evans's affidavit there was no probable cause to support issuing a search warrant for his apartment.

Thorpe also makes three new arguments that he did not raise below. He contends the search warrant was invalid under *Franks v. Delaware* (1978) 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667] because the affidavit Evans submitted to establish probable cause was materially misleading. Thorpe also argues the affidavit did not set forth probable cause to search his cell phone, and that the warrant was overbroad as to what police could seize from the phone. Anticipating that we might deem these new arguments forfeited, Thorpe contends his trial counsel rendered ineffective assistance in failing to move to suppress on these additional grounds.

13

## A. Legal Principles and Standard of Review

"A defendant may move . . . to suppress as evidence any tangible or intangible thing obtained as a result of a" warrant unsupported by probable cause. (§ 1538.5, subd. (a)(1)(B)(iii).) Determining whether probable cause exists involves "a practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [103 S.Ct. 2317, 76 L.Ed.2d 527] (*Gates*).) " '[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' [Citations.]" (*Id.* at p. 235.)

Where, as here, "the affidavit supporting the search warrant . . . contain[s] information derived from unlawful conduct as well as other, untainted, information . . . the reviewing court must excise the tainted information, but the warrant remain[s] valid if the remaining information provided probable cause for its issuance." (*People v. Weiss* (1999) 20 Cal.4th 1073, 1078.) We review de novo whether the search warrant affidavit in this case, excised of information obtained illegally, provided probable cause for the warrant. (*People v. Robinson* (2012) 208 Cal.App.4th 232, 241.)

## B. The Trial Court Did Not Err in Denying the Motion to Suppress Evidence Obtained from Thorpe's Apartment Via the Search Warrant

We agree with the trial court that the statement of probable cause, excised of the information obtained during the initial, warrantless entry into Thorpe's apartment, provided probable cause to search the residence. The affidavit recounted that police had received a call from McNeil, who said she was

14

Thorpe's ex-girlfriend, stating he told her that he had killed an elderly female for her 2003 red Porsche. McNeil indicated the incident happened three to four days earlier. She provided a specific address and stated that Thorpe was living there with his current girlfriend. LAPD patrol units went to that address but were unable to contact anyone inside. Villarreal then spoke with McNeil, who told Villarreal that a few days earlier Thorpe had said there was a dead body in his apartment, and he needed her help disposing of it. Thorpe said the body was in a drum inside his bedroom closet and showed the drum to McNeil. Villarreal called Thorpe at a cell phone number McNeil provided, and Thorpe answered. Thorpe later called LAPD back and stated he was not at his apartment but would drive there from where he was. Officers waited nearly two hours, but Thorpe never arrived.

These facts established a "fair probability that . . . evidence of a crime," would be found in Thorpe's apartment. (*Gates*, *supra*, 462 U.S. at p. 238.) McNeil had a personal relationship with Thorpe, and knew particulars about his address and phone number, the location of the dead body, and how it was stored. Thorpe asked NcNeil to help dispose of the body. Thorpe told police he would meet them at his apartment and then ghosted them. In totality, these facts established probable cause to believe there was a dead body in the apartment, or at least evidence that there had been a dead body stored there.

Thorpe contends the statement of probable cause (as excised) failed to suffice because it did not contain any facts establishing McNeil's "reliability" or "veracity." Under *Gates,* an informant's " 'reliability' " and " 'veracity' " are relevant, but are only elements of a larger, flexible approach, which requires the "magistrate . . . to make a practical, common-sense decision

15

whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Gates*, *supra*, 462 U.S. at pp. 233, 238.) As the *Gates* court explained, rather than being independent inquiries, an "informant's 'veracity' or 'reliability' and [her] 'basis of knowledge' . . . are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."[3] (*Gates*, at p. 233; see *United States v.*

---

[3] Contrary to Thorpe's suggestion, *Gates* did not hold that corroboration is required whenever probable cause is based on information provided by a member of the public. Nor does *People v. French* (2011) 201 Cal.App.4th 1307, also cited by Thorpe, stand for the proposition that reports from informants must always be corroborated to supply probable cause for a warrant. Corroboration was necessary in that case because "[t]here [wa]s little support for a conclusion that any of the three informants [wa]s reliable, and none of them provided significant information founded on firsthand observations." (*Id.* at pp. 1316-1317.) One informant provided information after he was arrested, and "the affidavit state[d] nothing about his reliability." (*Id.* at p. 1317.) The other two informants were put forth by the police as "confidential reliable informant[s]," but the affidavits failed to supply sufficient information to establish they had made reliable tips in the past. (*Id.* at pp. 1317-1318.) The circumstances surrounding McNeil's report in this case are much different, as she provided personal knowledge of what Thorpe told her and

16

*Phillips* (5th Cir. 1984) 727 F.2d 392, 395 [after *Gates* "[n]o longer do *both* the informant's reliability and the basis of his knowledge have to be set forth" to establish probable cause for a warrant].)

Here, the information provided in the statement of probable cause established McNeil had a "basis of knowledge" for her claim. In addition to the details it contained, McNeil's report was sufficiently reliable because she had disclosed her identity to police (who in turn disclosed it to the magistrate). If McNeil was lying and the police took action based on falsehoods, McNeil was exposed to potential criminal and civil liability, as well as possible retribution from Thorpe. Under these circumstances, it was unlikely that McNeil was making up her story. (See *People v. Rochen* (1988) 203 Cal.App.3d 684, 689 [concluding that based on the totality of the circumstances the police officer and magistrate "could reasonably conclude the [informant]'s statements were not part of an elaborate scheme to harass someone residing on the subject premises"].)[4] Thorpe contends the facts provided in the affidavit showed that McNeil had a motive to lie, given that she was his ex-girlfriend, and that her

what she saw in his apartment, and the fact she was openly reporting someone she personally knew suggested her claims were reliable.

[4] Thorpe quotes from *United States v. Martin* (5th Cir. 1980) 615 F.2d 318, where the court stated, "nothing is added to the affidavits by the naming of the informants." (*Id.* at p. 325, fn. 9.) This statement is inconsistent with the United States Supreme Court's later decision in *Gates*, which held that probable cause is to be determined under the "totality-of-the-circumstances." (*Gates*, *supra*, 462 U.S. at p. 238.)

report was suspicious because she apparently waited several days to contact police. The United States Supreme Court, however, has held such facts support the reasonable inference that McNeil was telling the truth and had decided to come forward when her relationship with Thorpe deteriorated. (See *Massachusetts v. Upton* (1984) 466 U.S. 727, 734 [104 S.Ct. 2085, 800 L.Ed.2d 721] [fact the informant had recently broken up with the defendant supported the magistrate's probable cause finding because it provided a motive for the informant to make her report].)

Thorpe asserts that McNeil was not a "selfless 'citizen informant' or 'eyewitness-bystander,' " which would afford her report with a presumption of reliability. (See *United States v. Phillips*, *supra*, 727 F.2d at p. 397.) This argument is unavailing because the magistrate did not need to rely on a presumption that McNeil's report was reliable. As discussed above, the circumstances of McNeil's report, including her firsthand knowledge and the fact her report put her at risk of consequences if it was false, adequately established her report was sufficiently reliable to establish a fair probability that a crime had been committed and there would be evidence of the crime in Thorpe's apartment. (See *People v. Rochen*, *supra*, 203 Cal.App.3d at p. 688 ["Even if doubts are entertained as to an informant's motives, an explicit and detailed description of alleged wrongdoing, along with a statement the event was observed firsthand, entitles the tip to greater weight than might otherwise be the case"].)

## C.     Thorpe Has Forfeited His Remaining Challenges

Thorpe's appellate brief asserts additional challenges to the search warrant that he failed to raise before the trial court. These include that Evans made material omissions in his

statement of probable cause rendering the search warrant invalid (*Franks v. Delaware*, *supra*, 438 U.S. at pp. 155-156; *People v. Bradford* (1997) 15 Cal.4th 1229, 1297), that Evans's affidavit did not provide probable cause to search Thorpe's cell phone, and that the warrant was overbroad because it failed to describe with sufficient particularity what information on his cell phone was within the scope of the search.

Thorpe forfeited these claims by failing to assert them in his motions challenging the warrant. " ' "No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." [Citation.]' [Citation.]" (*People v. Saunders* (1993) 5 Cal.4th 580, 590.) "The rule is designed to advance efficiency and deter gamesmanship. . . . ' " ' "The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." ' " ' " (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.)

Thorpe suggests that we exercise our discretion to consider these forfeited claims. We decline the invitation. (*People v. Tully* (2012) 54 Cal.4th 952, 979-980, & fn. 9 [specific claim not raised in the defendant's suppression motion in the trial court is forfeited on appeal]; *People v. Tousant* (2021) 64 Cal.App.5th 804, 817, fn. 5 [declining to address the defendant's "challenge to the scope of information sought by the warrant to search [his] cell phone" because he "failed to raise [the argument] in the trial court"].)

**D. Thorpe's Ineffective Assistance Claims Fail**

Given the forfeiture, Thorpe claims his trial counsel rendered constitutionally ineffective assistance by failing to raise each of the arguments he makes for the first time on appeal. We disagree with those ineffective assistance claims.

1. *Law Governing Ineffective Assistance of Counsel Claims*

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674] (*Strickland*).)

To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," measured "under prevailing professional norms." (*Strickland, supra*, 466 U.S. at p. 688.) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) "[W]e will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's . . . omissions." (*Id.* at p. 926.)

20

To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694.) "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 375 [106 S.Ct. 2574, 91 L.Ed.2d 305].)

2.      *Counsel's Failure to Pursue a* Franks *Motion*

Thorpe's defense counsel could have reasonably concluded there was no evidence that Evans "knowingly and intentionally, or with reckless disregard for the truth" made any false statements or material omissions in his warrant affidavit as required for a successful *Franks* motion. (*Franks v. Delaware*, *supra*, 438 U.S. at pp. 155-156.) "Competent counsel is not required to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record. Rather, competent counsel should realistically examine the case, the evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances." (*People v. Freeman* (1994) 8 Cal.4th 450, 509.)

Thorpe's contention that Evans's statement of probable cause falsely characterized what McNeil knew and believed does not withstand scrutiny. Thorpe argues Evans's statement of

21

probable cause was misleading because it did not set forth that McNeil had not seen a body, did not know how the victim was killed, and was not sure there even had been a murder. However, the affidavit accurately conveyed that McNeil reported that Thorpe told her there was a body in a cardboard box in his bedroom closet, showed her the cardboard box, and asked for her help in disposing of the body. This is consistent with McNeil's testimony about what she told police and, read fairly, does not suggest she had some independent knowledge of what occurred other than what Thorpe had told and shown to her.

Thorpe also relies on the omission from the statement of probable cause of McNeil's statement to police that she thought at one point Thorpe "may have been joking with [her] because he told [her] several different stories" about how the body came to be in his apartment. But there is no indication that by the time McNeil decided to contact police she had any reason to believe Thorpe was not serious about the body being there. McNeil testified that she believed Thorpe when he told her "[t]hat he had a dead woman in his place." Furthermore, the fact that McNeil decided to come forward demonstrated she took Thorpe's statements seriously.

Thorpe further contends the affidavit should have indicated that McNeil "was reporting [Thorpe] at least in part out of jealousy." That is not what she said. McNeil testified she told police about Thorpe spending time with Harris, but she did not testify that she was jealous or that she told the police she was jealous. McNeil instead decided to call the police when she saw that Thorpe had invited Harris over, which caused her to think McNeil might be "in danger because [she] thought that [Harris] had something to do with it also." In any event, the affidavit

22

included the information that Thorpe was McNeil's "ex-boyfriend" and that he was now living with a different woman, which alerted the magistrate that McNeil might have a personal motivation such as jealousy for making her report.

In sum, the record does not support a claim that Evans provided misleading information in his statement of probable cause or omitted material information from it, much less that he did so intentionally or with reckless disregard for the truth as required to prevail on a *Franks* motion. Thus, defense counsel did not act unreasonably in not pursuing a claim under *Franks*. Thorpe likewise fails to show he was prejudiced by his counsel's failure to make a *Franks* motion because such a motion would have lacked merit. (*Kimmelman v. Morrison, supra*, 477 U.S. at p. 375; *Strickland, supra*, 466 U.S. at pp. 693-694.)

3. *Counsel's Failure to Seek Suppression of Cell Phone Data Under the Fourth Amendment*

Thorpe's claim that his trial counsel was ineffective for not moving to suppress the contents of his cell phone on Fourth Amendment grounds fails because counsel could have conceivably concluded there were no grounds for such a motion. Thorpe makes two basic arguments—that Evans's affidavit failed to provide probable cause to search Thorpe's cell phone, and that the warrant lacked the required particularity in terms of what information it authorized police to search for and seize.

Any motion to suppress based on these arguments would have failed under the good faith exception to the exclusionary rule. "Evidence obtained by police officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate is ordinarily not excluded under the Fourth Amendment, even if a reviewing court ultimately determines the

23

warrant is not supported by probable cause." (*People v. Garcia* (2003) 111 Cal.App.4th 715, 723, citing *United States v. Leon* (1984) 468 U.S. 897, 900 [104 S.Ct. 3405, 82 L.Ed.2d 677].)

To defeat the good faith exception with regard to his lack of probable cause argument, Thorpe would have had to show "the affidavit [wa]s ' "so lacking in indicia of probable cause" ' " that it would be entirely unreasonable for an officer to believe such cause existed. (*People v. Meza* (2023) 90 Cal.App.5th 520, 543.) " 'If the officer "reasonably could have believed that the affidavit presented a close or debatable question on the issue of probable cause," the seized evidence need not be suppressed.' [Citation.] The absence of any legal authority directly on point and the existence of arguably supportive legal authority renders the issue of probable cause debatable. [Citation.]" (*People v. Garcia*, *supra*, 111 Cal.App.4th at p. 723.) The affidavit included facts as to why evidence might possibly be on the cell phone, and was certainly not so lacking in evidence that no reasonable person could have relied on it. Nor does Thorpe cite any binding legal authority directly on point which supports his claim.[5] Thorpe

_____

[5] The case most supportive of Thorpe's position is *State v. Baldwin* (Tex.Crim.App. 2022) 664 S.W.3d 122, in which the Texas high court for criminal appeals held "generic, boilerplate language about cell phone use among criminals" was insufficient to establish probable cause, and that "specific facts connecting the items to be searched to the alleged offense are required for the magistrate to reasonably determine probable cause." (*Id.* at p. 134.) Putting aside that this case is not binding and no California court has adopted its reasoning, *Baldwin* was decided after the warrant in this case was issued. It is therefore irrelevant to whether Evans reasonably believed when he obtained the warrant that it was supported by probable cause.

24

argues the good faith exception does not apply because the affidavit was materially misleading, but we have rejected that argument.

Any motion to suppress the cell phone data based on purported lack of particularity would similarly have failed under the good faith exception. To defeat the exception, Thorpe would have had to show the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or things to be seized—that the executing officers c[ould ]not [have] reasonably presume[d] it to be valid." (*United States v. Leon*, *supra*, 468 U.S. at p. 923, italics omitted.) Thorpe could not have satisfied this standard because the warrant limited the search to data relevant to the suspected murder and identified the categories of data subject to search and seizure. Furthermore, even where a warrant fails to particularize items within one of several categories, it does not mean "that no reasonable officer could presume it to be valid." (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1293.)

In sum, Thorpe's trial counsel could have reasonably decided against filing a motion to suppress the cell phone data because such a motion would have lacked merit. Thus, Thorpe fails to show either deficient performance or resulting prejudice. (*Kimmelman v. Morrison*, *supra*, 477 U.S. at p. 375; *Strickland*, *supra*, 466 U.S. at pp. 693-694.)

4. *Counsel's Failure to Seek Suppression under State Law*

Thorpe lastly argues his trial counsel was ineffective for failing to seek suppression of his cell phone data under the Electronic Communications Privacy Act (ECPA; § 1546 et seq.). This argument fails because counsel could have concluded a

25

motion to suppress under ECPA lacked merit, and also because there is no "reasonable probability" such a motion to suppress would have succeeded. (*Strickland*, *supra*, 466 U.S. at p. 694.)

"Any person in a trial, hearing, or proceeding may move to suppress any electronic information obtained or retained in violation of" ECPA. (§ 1546.4, subd. (a).) As relevant here, ECPA requires that a warrant "describe with particularity the information to be seized by specifying, as appropriate and reasonable, the time periods covered, the target individuals or accounts, the applications or services covered, and the types of information sought." (§ 1546.1, subd. (d)(1).) It further provides "the court may determine that it is not appropriate to specify time periods because of the specific circumstances of the investigation, including, but not limited to, the nature of the device to be searched." (*Ibid*.) Thorpe claims the warrant violated these precepts.

We disagree. The warrant identified Thorpe's cell phone as the device to be searched, was limited to evidence relevant to the suspected murder, identified the applications or functions on the phone where the data would be located, and identified the types of information sought, including "communications content," "location data," "photographic/audio/video," "[I]nternet history," "financial information," and "indicia of ownership." ECPA only requires a time limitation "as appropriate and reasonable" and expressly provides, with respect to warrants such as the one at issue here, "the court may determine that it is not appropriate to specify time periods because of the specific circumstances of the investigation . . . ." (§ 1546.1, subd. (d)(1).) Here, the magistrate included a time limitation of July 20 to July 30, 2019, for some data, and could reasonably decide not to specify a time limitation

on other data to be seized because the police had just begun their investigation and did not know any details about the suspected murder or even the identity of the victim.

Thorpe also contends that the warrant violated ECPA because "it failed to establish a nexus between the specific things to be searched and the evidence law enforcement is seeking."  The plain language of ECPA does not require such a nexus.  In any event, assuming one is required, the warrant here complied.  The statement of probable cause described types of information that would probably be found on Thorpe's cell phone.  Evans opined, based on his training and experience, that communications on several phone applications might contain "direct and indirect statements" about the crime.  The affidavit indicated that Thorpe had solicited McNeil's help in disposing of the body, raising the possibility the phone contained communications between them on that subject; in addition, the magistrate could reasonably infer that McNeil had stopped providing any assistance, Thorpe therefore might ask someone else to help, and that the phone would contain relevant communications between Thorpe and that other person.  Evans also indicated the phone would probably have evidence of Thorpe's historical location, which Evans explained was important "[b]ecause the evidence in this case doesn't indicate where this crime occurred."  Evans also stated his "belie[f that] the GPS location, financial information, cookies, bookmarks, web history, search items and [I]nternet search history on digital devices and cellular devices may contain relevant evidence such as the interaction of the decedent and suspect."  Lastly, the affidavit indicated that Villarreal had called the cell phone and spoken with Thorpe, which confirmed that Thorpe used his cell phone, and also that the cell phone would

27

contain evidence of the call during which Thorpe lied about where he was and his willingness to meet with police at his apartment.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.

M. KIM, J.